[L. A. No. 5377. In Bank.—November 19, 1920.]

WALTER C. BAKER, Plaintiff and Respondent, v. THE SOUTHERN PACIFIC COMPANY (a Corporation), Defendant and Appellant; ATLAS MIXED MORTAR COMPANY (a Corporation), Defendant and Respondent.

[1] NEGLIGENCE—INJURY TO RAILROAD EMPLOYEE—INTERSTATE COMMERCE — CARRIER OF UNITED STATES MAIL — FEDERAL EMPLOYERS' LIABILITY ACT.—In an action to recover under the federal Employers' Liability Act for personal injuries sustained by a locomotive fireman while discharging his duties, a finding that the train upon which he was working at the time of the accident was engaged in interstate commerce is amply supported by the testimony

----

1. Employees entitled to protection under federal act, notes, Ann. Cas. 1914C, 164; Ann. Cas. 1915D, 319; Ann. Cas. 1916D, 232; Ann. Cas. 1916E, 472; Ann. Cas. 1918B, 55, 70; 11 A. L. R. 1184.

of a railway postal clerk that the train was carrying registered letters coming from and destined to points outside of the state.

[2] ID.—IMPENDING COLLISION — LEAP OF LOCOMOTIVE FIREMAN — OPERATION OF AIR-BRAKES—EVIDENCE.—In this action for injuries sustained by a locomotive fireman in jumping from his engine to avoid the effect of a collision with the trailer of a stalled motor truck, there was no substantial evidence to support a finding of negligence on the part of the engineer in releasing the air-brakes about nine hundred feet from the crossing after rounding a curve, whereby the brakes could not be applied in time to avoid the collision.

[3] ID.—SPECIAL DAMAGES—EVIDENCE—LINE OF PROMOTION.—In an action for damages for personal injuries sustained by a locomotive fireman while engaged in the performance of his duties, testimony that he was in line of promotion to the position of locomotive engineer at an increased salary with only one man ahead of him was admissible in reference to his reasonable future expectations.

APPEAL from a judgment of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Reversed.

The facts are stated in the opinion of the court.

Henry T. Gage and W. I. Gilbert for Defendant and Appellant.

C. P. Johnson for Plaintiff and Respondent.

H. T. Morrow for Defendant and Respondent.

LAWLOR, J.—This is an appeal by the defendant, Southern Pacific Company, a corporation, from a judgment for ten thousand dollars against said defendant and in favor of the plaintiff, Walter C. Baker, in an action to recover damages for personal injuries alleged to have been sustained as the result of the negligence of an engineer of said defendant in operating a steam locomotive.

It appears that on September 9, 1915, the respondent Baker was in the employ of appellant as a fireman. On that day the respondent was discharging his duties as such fireman on a passenger train running between Shorb, Los Angeles County, and the city of Los Angeles. About one mile east of Eastlake Park there was a grade crossing where the tracks intersected a wagon road. Just prior to the ar-

rival of the train at this crossing a motor truck, with a trailer in tow loaded with empty cans, had crossed the railroad. The truck became temporarily "stalled" immediately after crossing and stopped, thus leaving the trailer standing on the tracks. The truck driver thereupon descended and examined his machine, but before he could repair the trouble and move on he heard the whistle of the approaching train and started up the track in that direction to try to stop it. Silas M. Collins, the engineer, testified that about two thousand five hundred feet from the crossing the train swung into a curve, and that the trailer could not be seen from the locomotive until the engine finished rounding the curve, seven hundred feet from the crossing. At any rate, as the train entered upon this curve the engineer applied his airbrakes and later released them on coming into the straightline track—as he testified, about nine hundred feet from the crossing. This release temporarily reduced the air pressure to a point where several seconds were required in order to recharge the tanks before enough air would be available quickly to stop the train. The engineer further testified that he first saw the trailer about seven hundred feet away and did not at that time notice it was "standing still"; that about five hundred or six hundred feet from the crossing he saw the truck driver "standing right near the trailer, waiving his hands in a violent manner"; and that he immediately "made an emergency application of the brakes as well as I could under the circumstances," but that, realizing the brakes, due to the reduced air pressure, could not stop the train before the locomotive would strike the trailer, and thinking—as also did respondent, according to his testimony—that the cans on the trailer contained "something explosive and highly inflammable," he and the respondent jumped from the engine, which resulted in the injuries to respondent for which he now seeks damages.

The Atlas Mixed Mortar Company, a corporation, the owner of the truck and trailer, was made a party defendant to this action, but the verdict of the jury was in favor of this defendant, and the respondent has not appealed from that portion of the judgment. The Southern Pacific Company, however, appealed therefrom.

1. The respondent seeks to recover under the federal Employers' Liability Act, and alleges in his complaint that at

the time of the accident ''he was empoyed by defendant . . . on an interstate commerce train.'' In this connection appellant now assigns error to the admission, over appellant's objection, of respondent's testimony that on previous occasions, while he was working on this train, he had noticed that it carried interstate freight, and of the testimony of Robert W. Coleman and I. B. Gotfredson, conductors of the train, as to the interstate or intrastate character of the passenger traffic which it customarily carried. With regard to the testimony of the two last-named witnesses, it may be observed that it was very indefinite and that the substance of their answers to the questions propounded by respondent's counsel as to whether or not they had ever taken up any interstate tickets on this train was that they could not remember. But, assuming that, as appellant claims, all this testimony was ''incompetent, irrelevant and immaterial and did not tend to prove or disprove the issue as to interstate commerce on the day of the accident,'' we cannot see how its admission prejudiced appellant. From the verdict it must be implied that the jury found the train upon which respondent was working at the time of the accident was engaged in interstate commerce. [1] This finding is amply supported by the testimony of Frank E. Page, who was employed as a railway postal clerk on the train, that it was carrying registered letters coming from and destined to points outside of the state. (*Zenz* v. *Industrial Acc. Com.*, 176 Cal. 304, [L. R. A. 1913D, 423, 168 Pac. 364], citing *Lynch* v. *Boston & M. R. R.*, 227 Mass. 123, [L. R. A. 1918D, 419, 116 N. E. 401].)

2. We shall next consider appellant's contention that the jury was not warranted ''in concluding that the engineer was guilty of negligence.'' In order that the circumstances under which respondent was injured may clearly appear, it will be proper briefly to describe the scene of the accident. The train was running from Shorb, a station about seven miles east of Los Angeles, into that city. There was a ''downgrade'' of about two miles of track from Shorb to the crossing where the accident occurred. In summarizing the evidence we shall, for convenience, use the letter A to indicate the crossing where the trailer was stalled, B the place at which the train entered upon the curve, east of the crossing,

C the point at which the engineer released the air, and D the point at which he applied the emergency brakes.

The respondent testified that it was about six hundred feet from B to C, four hundred or five hundred feet from C to D, and six hundred feet from D to A; that from C to A there were "no trees or houses or anything to obstruct the view in the right of way nor close enough to the right of way to obstruct the view. There are trees on the outside of the right of way, but that does not obstruct the view. The line of vision from C to A does not come enough outside of the right of way to reach any trees." He further stated that the engineer had a clear view from C to A, but that he himself, because of the curve in the tracks and his position on the opposite side of the locomotive from the engineer, could not see the crossing from C; that the speed of the train at B was about forty-five miles, and at C thirty to thirty-five miles per hour; that B was at least a mile inside . . . of the Los Angeles yards; that if the air had not been released at C it would have been possible to bring the train to a full stop within three hundred or four hundred feet, but that, the air having been released at C, the pressure was thereby so decreased that after the brakes were set at D "the train would run probably six or seven hundred feet before coming to a stop"; that the equipment and appliances on the engine were "in perfect working order"; that when the engineer released the air at C "it would take about a couple of minutes to recharge so that he would have more air," but that at the speed at which the train was moving at C it would travel thence to A in about ten seconds; that he had nothing to do with regulating the speed of the train; that after the engineer had released the air "there was nothing that he could have done to avoid the accident up at A that he did not do"; that he did not know whether the engineer actually saw the stalled trailer before applying the "emergency"; that when he himself saw the trailer he thought the cans contained dynamite or giant powder and also "figured there might be a derailment"; that he did not see the truck driver waving his hands until he was just leaving the engine, when it was too late to get back; that before he left the locomotive the engineer reversed the engine; and that if the latter had not released the air at C, "where he could have seen the obstruction, he could have brought the train to a stop before

reaching A." On cross-examination he testified that, if the truck had not been "stalled" at the crossing, it would have been proper to release the air at C.

Richard W. Kelly, an engineer, testified that if the emergency brakes were applied to a train composed of a locomotive and six cars traveling at a speed of forty-five miles an hour on a level track, the train would run 750 feet before coming to a stop; that "the more cars you have the quicker the stop"; that "under practical conditions" if an engineer brought his train, of a locomotive and three cars, to a stop within 750 feet, he would think it "a very fair stop"; and that a train of an engine and three cars "going at thirty-five miles an hour under these circumstances wouldn't go over 650 feet" after an emergency application of the brakes.

W. H. Whalen, superintendent of appellant's Los Angeles division, testified that the point A was "within the yard limits as outlined by the limit board," although "not the actual operating yard."

Joe Esposito, the truck driver, stated that when he first saw the train it was about seven or eight hundred feet away, "and I say that at that time the whole engine was not in view, just a part of it."

J. F. Garrett, who had just crossed the railroad tracks at A when the accident occurred, testified that he saw the train about 850 or 900 feet away going about twenty miles an hour.

Charles T. Phelps, train baggageman, testified that he "heard the air go on at D at the distance of from four hundred to six hundred feet from the scene of the collision."

The engineer stated that his speed limit at B was fifty miles per hour; that the release of the air left the engine "for a period of time without an emergency feed"; that it was approximately two thousand five hundred feet from B to A, nine hundred feet from C to A, and six hundred feet from D to A; that he could not have seen the trailer until he was within seven hundred feet of the crossing; and that "I did not apply my emergency immediately upon seeing the trailer across the tracks because I did not know but it was moving, when I first saw it. Going around the curve you get a kind of vision of things, things are changing in relation to one another, changing positions, you know, so when I first saw it, I didn't know they were stalled there . . . because I was going around a curve." He further

stated that at C the train was moving at about twenty miles an hour; that at no point between Shorb and Los Angeles was he travelling forty-five miles an hour; that from C he could not see either the truck or the trailer "on account of the curve and the trees outside of the right of way"; that between C and D he did not have time to recharge the air or get "the braking power back to full capacity"; that about forty feet from the crossing there was "a block-signal pole," the upper half of which he could see as he approached it, about one thousand feet from A; that if at C he had received the signal "Stop," he could have stopped before reaching A; that he did not remember whether, at the time he first saw the signal pole, the crossing was visible; that "the trailer was a pretty high rig . . . so that the upper half of the trailer was about ten and one-half feet above the roadway"; that if the brakes had not been released at C he could have made a further application of the air already in the brake cylinders and stopped the train before reaching A; and, as to the various distances between the points indicated, that his estimates were "just a matter of guess, and they might be 150 or two hundred feet either way." The evidence showed that it was his duty, under ordinary circumstances, to apply the air-brakes at the point where he did apply them and to release the air as he did.

Gotfredson testified that for some time prior to the accident he had been sitting in the smoking-car, one car removed from the engine and tender; that he was looking out of the window in the direction in which the train was moving; that as soon as he saw the trailer on the tracks he "reached up and caught the emergency, but he [the engineer] had already used all the air then. We were about one thousand feet from the truck at that time, maybe a little bit more . . . while we was rounding the curve. . . . The truck and trailer was plain so I could see it." On cross-examination he stated when he first saw the trailer the train was moving at about twenty-five miles an hour, and that after the air was released at C the engineer could not have stopped the train before reaching A.

Is there sufficient evidence to support the implied finding that the engineer was guilty of negligence in releasing the air at C? Under the rule of conflict we shall assume, as established, that the distance between C and A was one thou-

sand feet; that the speed of the train at C was thirty-five miles per hour; that the trees along the right of way did not obstruct "the line of vision" between C and A; that the trailer was visible from C; that, as respondent testified, the train could have been stopped within three hundred or four hundred feet (although another witness for respondent fixed it at 750 feet); and that if the air had not been released at C the train could have been stopped before reaching A.

But, as tending to negative negligence on the part of the engineer, is his testimony that, due to the angle at which the train, in rounding the curve, was approaching the crossing, several seconds elapsed after he first saw the trailer before he could realize that it was not going to proceed on its way and clear the tracks, and that after applying the emergency, "I had put all the mechanical parts of the engine into application to stop the train that I could put into action, and there was nothing else that I could do to stop the train that I had not done." This testimony was not controverted. In fact, the respondent, as already shown, stated that after the air was released at C nothing was left undone by the engineer to avert the accident; that if the truck had not been stalled at A it would have been proper to release the air at C; that from his side of the engine at C he could not see the trailer, and that he saw it for the first time from D; and that "on a curve an engine rocks a great deal, and you can't distinguish things like you can standing still, on account of the motion of the engine." Moreover, as indicated above, under ordinary circumstances, the setting of the brakes at B and the release of the air at C were proper; indeed, it would have been the duty of the engineer, in the absence of some special circumstance which required him to act differently, to release the air on completing the curve.

The position of respondent is that the proximate cause of the injury was the release of the air by the engineer at C. Appellant contends, on the other hand, "that there was no testimony offered which would tend to show there were any acts of negligence on the part of the defendant . . . which contributed directly and proximately to the injury."

It is conceded in appellant's brief that the respondent, in jumping from the locomotive, "had the right to act upon the appearance of danger"; no claim is made that the injuries received by respondent were due to contributory negligence.

The question of negligence is a question of fact for the jury, and the determination of the jury upon such question of fact will be deemed conclusive upon appeal, where there is any substantial evidence to support it. (*Imperial V. M. Co.* v. *Southern Pac. Co.,* 15 Cal. App. 385, [114 Pac. 1003].)

It is clear from the facts assumed to be true that the trailer could have been seen before the engineer released the air, and that if he had appreciated the danger of a collision the accident could have been averted. On the other hand, it cannot be questioned that, due to the motion of the engine and the angle at which the train was approaching the crossing, it would have been difficult to realize that the trailer was stalled. As has been noted, respondent concedes that after the air was released the engineer did all that could be done to stop the train. And in measuring the conduct of the engineer it must be kept in mind "that a railroad track is in and of itself a sign of danger, and that one approaching such track with intent to cross it is bound to exercise his faculties of sight and hearing in order to ascertain whether a train is approaching." (*Loftus* v. *Pacific Elec. Ry. Co.,* 166 Cal. 464, 467, [137 Pac. 34, 35].) This the engineer had a right to assume in the operation of the train, and upon this theory the natural assumption would be that the trailer was moving. In this connection the fact that the trailer was one thousand feet away should not be overlooked. As we have said, respondent's testimony is that up to the time the air was released he could not, from his side of the engine, see the trailer, and there is no suggestion that the engineer actually saw it or had any intimation that there was any obstruction on the track before he released the air. We do not think it can be said that the engineer should have realized that the trailer was stalled at the time he released the air. The engine had not yet completed the curve, and, viewing the entire situation at that distance, a reasonable conclusion would be, even assuming the engineer saw the trailer, that it would be out of the way before the train reached the crossing. [2] In any event, there was before the jury no substantial evidence upon which it could be found that the engineer acted negligently in releasing the air. Any finding to the contrary must necessarily rest upon conjecture.

3. In view of this conclusion it will not be necessary to discuss appellant's contentions "that upon the undisputed testimony the respondent assumed the risk, if any there was, in the speed of the train at this particular point," and that the amount of the verdict constituted excessive damages. [3] It will be proper, however, to consider appellant's assignment of error in the admission of respondent's testimony that firemen were usually promoted to be engineers at an increased salary, that he was twice "out for promotion," that there was only one man ahead of him on the seniority list, and that this man and the man under him on the list had been promoted since the accident. The claim is that this testimony was "too remote." The complaint laid the foundation for special damage on this account. *Galveston etc. Ry. Co.* v. *Ford* (Tex. Civ. App.), 46 S. W. 77, was a case where the dependents of a deceased fireman sued to recover damages for his death alleged to have been caused by the negligence of the defendant Railway Company and its employees. With regard to the testimony of a witness that the decedent "was in the line of promotion to the position of locomotive engineer," the court said: "This was proper testimony in reference to his reasonable future expectations, which the authorities agree are a proper element of damages in this class of cases." It needs no argument to bring the facts of this case within the rule thus announced. Appellant's contention cannot be sustained.

The judgment is reversed.

Shaw, J., Olney, J., Wilbur, J., Lennon, J., Angellotti, C. J., and Sloane, J., concurred.

Rehearing denied.

All the Justices concurred.