[Civ. No. 95. Fourth Appellate District.—March 28, 1930.]

F. J. GUNDRY et al., Respondents, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation), Appellant.

Robert Brennan, M. W. Reed, Leo E. Sievert, H. K. Lockwood and E. T. Lucey for Appellant.

Brittan & Brittan for Respondents.

BARNARD, Acting P. J.—This is an appeal from a judgment based upon the verdict of a jury and from an order denying a new trial.

The action arose out of a collision between a locomotive operated by the defendant and a truck and trailer operated by one McCormac, who was driving the same for the plaintiffs. The collision occurred in the city of Bakersfield on October 31, 1926. Plaintiffs alleged negligence in the following language:

"That at said time and place, as aforesaid, the defendants did negligently, carelessly, and without due regard for the safety of others, operate, propel, and drive an engine into, and so as to collide with the trailer operated by these plaintiffs, thereby destroying, breaking and damaging said trailer to the extent of and to the plaintiffs' damage in the sum of $553.60."

The complaint also demanded $35 as the reasonable rental value of the trailer for fourteen days. The answer of the defendant denied all of the material allegations of the complaint.

The undisputed facts are, that the defendant has three standard gauge railroad tracks across "F" Street, in the

city of Bakersfield; that "F" Street is paved, is about fifty-five or sixty feet wide from curb to curb, with ten additional feet on each side for sidewalks, and the crossing is level; that at the time of the collision the weather was clear, the sun shining, the street dry, and the truck was in good condition and functioning properly; that the truck driver was approaching the railroad tracks from the north; that the engine pulling one car was west of "F" Street and moving easterly on the third or most southerly track; that when the truck driver was at a point ten feet or so north of the north track, and from sixty to seventy feet from the point of collision, he saw the locomotive approaching from the west, being then about three hundred feet away; that the truck driver proceeded across the track, increasing his speed as he went; and that he succeeded in clearing the last track with his truck, but the rear end of the trailer was hit by the engine and damaged. The driver of the truck testified as follows:

"I came into town with a truck, a twelve or twelve and a half ton truck and I turned off Sixteenth street to the left down to the south on F street toward the Santa Fe railroad and I made the boulevard stop, and it is necessary to shift down into low gear, and I proceeded down F street to the tracks and as I approached the tracks I was going rather slow and as I came upon the tracks there was no sign of any train coming from either direction or any watchman out there as I was accustomed to seeing; that is the way I always go home; I have lived out that way for a long time; and as I got close to the north track there I saw a switch engine with one car behind it coming from the west approximately a block away and there was no signal and no watchman out there on duty. I glanced over at the little house where the watchman stays and I noticed the stop signal standing down there where it always stands when he is in the house, and the bell was not ringing, and I had been accustomed to seeing the switch engine come down there and stop there and stop and switch on to another track, and I supposed that is what they were going to do at this time.

"Mr. Lucey: I object, your Honor, to what he supposed, and ask that that portion of his answer may go out.

"The Court: What he supposed can go out.

"A. (Continuing) : I started on the track and the engine just kept coming and I shifted into second gear; after I was out on the tracks I had to go ahead, and I went into second gear and got up as much speed as I could and just as I crossed,—the front end of my truck cleared the last tracks, so I could look down and see the engineer, why I noticed he jumped like he was going to apply the brakes, and then he was far enough away so he could see my trailer and then he settled back in his comfortable position like he thought everything was all clear, and my trailer at that time was now on the last track and he just kept coming and just before he struck the trailer, why he appeared to apply. the brakes but he could not stop. He hit the back end of the trailer and pushed it off the track. I guess he went about ten feet after he struck it."

This witness also testified that he was proceeding near the center of "F" Street, and that as he crossed the last track so he could see the engineer, the front part of the engine was approximately fifty or sixty feet away. In reference to this time, he gave the following testimony: "Q. And he was about that distance when you saw him jump forward in his cab of the engine? A. Yes. Q. Now at that point could you have speeded up the speed of your truck and trailer? A. No more than I did, no, sir, because I had a big load and you can't pick up a load of that size very fast." He further testified that when he first saw the engine it was about three hundred feet away, near a switch which was located at that point, and that he did not hear any whistle or bell; that after the accident he talked to the watchman, who stated he had gone into the depot at the time of the accident; that he had been acquainted with this particular crossing and railroad tracks since 1919, and had lived out that way since 1921, and crossed at that point sometimes five or six times a day; that he could have seen the locomotive a few yards north of the point where he did see it; that he was traveling in low gear when he first saw the engine, at the rate of between four and seven miles an hour; that he had a load of nine tons; and that traveling at that rate of speed he could stop his truck and trailer in from five to ten feet. He also testified: "Q. How close were you to the south track on which the engine moved across 'F' street

when you increased your speed of your truck? A. Well, I increased all the way across, that is I tried to as much as I could; as soon as I got on the tracks''; that he traveled probably sixty or seventy feet from the time he first saw the engine until it hit the trailer; and that he increased the speed of his truck from low to second gear when he was about on the first or north track, and the truck was going possibly eight or ten miles an hour, when it was hit. Also, ''Q. If you had wanted to stop your truck instead of speeding up you could have stopped your truck could you not before you got to the southerly track? A. I would have had to stop on another track.'' And also: ''Q. What caused you to look to see what the engineer was doing? A. I was wondering why he did not stop.''

The plaintiffs called the engineer who was in charge of the locomotive in question, who testified that he was going from eight to ten miles an hour and that he could stop the engine in probably fifty or sixty feet, at that rate of speed; that he first saw the truck when it came across in front of him, at which time he was from eight to ten feet away. Plaintiffs also called as a witness a lady who came up to the same crossing in an automobile driven by her husband, just prior to the accident. She testified that as they came up to the tracks on the north side, she saw an engine about fifty feet west of the crossing, which she thought was standing still; that they were going to cross the track, but just as they got almost to the north track, she saw the engine steam up and start forward, and she told her husband to stop, which he did; that the first time she saw the truck and trailer, the front part of the truck was on the south rail of the south track; that the trailer did not clear the track and the engine hit it, stopping just after the impact; that she did not hear any bell or whistle or other warning; and that she thought the engine was going not to exceed ten miles an hour. She admitted having made a previous statement to the effect that she could not say whether or not the engine bell was ringing. In talking about the truck and trailer, she testified as follows: ''Q. You did not follow it down F street? A. No I did not see it until it was on the tracks. Q. And that happened in a flash of a second? A. It seemed to me it was more than seconds because I sat there and hoped the

truck would get across before the engine hit it. Q. Would you say it was four or five seconds? A. It was not very long, but it seemed a long time.''

At the close of the plaintiffs' case, the defendant moved for a nonsuit, which motion was denied. We think this motion should have been granted, as the evidence for the plaintiffs, taken in its most favorable light, shows contributory negligence on the part of the driver of the truck, as a matter of law. In *Chrissinger* v. *Southern Pac. Co.*, 169 Cal., at page 624 [149 Pac. 175, 177], the court says:

"A person approaching a railway track, which is itself a warning of danger, must take advantage of every reasonable opportunity to look and listen. Undoubtedly the question of contributory negligence or freedom from it is ordinarily one for the jury, but where, as here, the standard of conduct is so obvious as to be applicable to all persons, and the plaintiff has failed to measure up to that standard under the circumstances shown, he is not entitled to have his case go to the jury. (*Hamlin* v. *Pacific Elec. Co.*, 150 Cal. 779 [89 Pac. 1109].)''

In that case the court held that the plaintiff's testimony that he looked and listened, but did not see or hear, is not enough to support a verdict in his favor, where the circumstances and conditions were such as to make it plain that by looking and listening he must have observed the approach of the train. The circumstances of the present case are even stronger, since the truck driver actually saw the approach of the engine and car, and disregarded the same. The truck driver testified that he was familiar with the crossing in question; that after he saw the engine approaching he speeded up his heavily loaded truck as much as he could; that he could have stopped within five or ten feet, although this would have compelled him to stop upon other tracks, there being no evidence that any other engines or trains were approaching; that he looked up at the last moment because he wondered why the engineer did not stop the engine; and he also testified as follows:

"Q. Did you keep your eye on the engine all the time up to the time of the collision? A. Why, no, I guess I watched my truck part of the time.

"Q. Well, where was the engine the second time you noticed it? A. I don't suppose my eye was off it more than a fraction of a second at a time."

The plaintiffs' evidence indicates that the truck driver tried to beat the locomotive over the crossing, but whether or not this was his original purpose, the law places upon him a very definite duty to look and listen and to stop, if necessary, in order to make sure that he may proceed on his way with safety. Not only is it his duty to look and listen, as has been held in countless cases, but where one actually sees the approaching danger, thus close at hand, it is incumbent upon him to take warning from what he does see. A traveler is bound to look and listen, and, if necessary, to stop, and that obligation is increased rather than diminished by his knowledge that a train is approaching. (*Young* v. *Southern Pac. Co.*, 182 Cal., at p. 378 [190 Pac. 36].) This would seem to be especially true in this case, where the great weight of his load and the slow speed possible with the truck in low and intermediate gears made such a contest particularly dangerous. The fact that from the beginning he increased his speed, and as he says, "got up as much speed as I could," shows that he realized the danger. It would be little short of ridiculous to hold that the law requires a traveler to look and listen, and even to stop, if necessary, at a railroad crossing, in order to ascertain if a train is approaching, but does not require such a traveler to refrain from attempting to cross in front of the train, when he actually sees it approaching. The United States Supreme Court in the case of *Baltimore & Ohio R. R. Co.* v. *Goodman,* 275 U. S. 66 [56 A. L. R. 645, 72 L. Ed. 167, 48 Sup. Ct. Rep. 24, 25], said:

"When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him."

Respondents argue as follows:

"If it were possible, . . . that the truck driver could have seen the engine coming, to the crossing, it is just as sure that the engineer and fireman could see the truck driver going across the crossing. In other words, each of them stand on the same footing as to their seeing the other cross the tracks."

While there may be some difference in the rules of law and their application to the operation of railroads outside of cities, and those covering their operation across city streets, no such rule as is here contended for exists anywhere. The duty was upon the driver of this truck, not only to look and listen, but to heed what he saw. (*Billig* v. *Southern Pac. Co.*, 192 Cal. 357 [219 Pac. 992]; *Chrissinger* v. *Southern Pac. Co., supra.*) In paying no attention to what he saw, the driver of the truck was guilty of contributory negligence. (*Young* v. *Southern Pac. Co.*, 189 Cal. 746 [210 Pac. 259]; *Griffin* v. *San Pedro etc. Co.*, 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282]; *Jones* v. *Southern Pac. Co.*, 34 Cal. App. 629 [168 Pac. 586]; *Thompson* v. *Southern Pac. Co.*, 31 Cal. App. 567 [161 Pac. 21].) In *Murray* v. *Southern Pac. Co.*, 177 Cal., at p. 6 [169 Pac. 675, 676], the court says:

"The general rule applicable to negligence cases may be stated to be: That, even when there is no conflict in the evidence, negligence is a question of fact for the jury, if different conclusions upon the matter can rationally be drawn from the evidence (*Fernandes* v. *Sacramento etc. R. R. Co.*, 52 Cal. 45; *McKeever* v. *Market St. R. R. Co.*, 59 Cal. 294; *Chidester* v. *Cousolidated D. Co.*, 59 Cal. 197; *House* v. *Meyer*, 100 Cal. 592 [35 Pac. 308]); but if but one conclusion can reasonably be reached from the evidence, it is a question of law for the court."

The respondents contend that no negligence may be charged to the driver of the truck, because he was familiar with the crossing, knew that a watchman was usually there, and that he was justified in assuming from the absence of the watchman that no train was approaching. They rely upon the following quotation from *Gregg* v. *Western Pac. R. R. Co.*, 193 Cal. 212 [223 Pac. 553, 557]:

"It is true, as has often been stated, that a railroad crossing is itself a place of danger and is an effectual warning of danger which must always be heeded and the exercise of ordinary care in traveling over such place is not excused by the negligent omission of the railroad company itself to exercise reasonable care. But it is also true that a railway company will not be permitted to encourage the public to relax its vigil as to the dangers that lurk in railroad crossings by assurances that the danger has been removed or minimized by the adoption of safety devices and measures

and at the same time hold a person to the same *quantum* of care as if no such safety measures had been provided.''

The answer to this is that no matter what he might otherwise have been entitled to assume, he actually saw the engine and car approaching, and while constantly watching it, attempted to cross in front of it. In the case just quoted from, the Supreme Court uses this language:

''We do not here hold that one who blindly attempts to cross a steam railroad track, whether the crossing be guarded or unguarded, and by reason of such negligence is injured by being hit by a passing train has a cause of action against the railroad company. The law casts upon everyone the duty of exercising such care as is commensurate with the situation.''

The driver of the truck had neither the right to assume that the engine would not cross the street, nor the right to attempt to cross directly in front of and while watching the approaching train. A very brief pause, after seeing the danger, would have avoided the injury complained of.

The respondents insist that, whether or not the driver of the truck was guilty of contributory negligence, the matter is immaterial, and is not available as a defense, for the reason that contributory negligence was not alleged in the answer of defendant. In the case of *Hoffman* v. *Southern Pac. Co.*, 84 Cal. App., at page 346 [258 Pac. 397, 400], the court says:

''As a general rule the contributory negligence of the plaintiff must be specially pleaded by the defendant in order that he may rely upon this defense (19 Cal. Jur. 681, sec. 104). But where the plaintiff's contributory negligence appears from the allegations of his complaint or from the evidence introduced in his behalf, this plea is available to the defense although it is not pleaded in the answer (19 Cal. Jur., p. 681, sec. 104; p. 697, sec. 119; 20 R. C. L. 182, sec. 151; 20 Standard Ency. of Proc. 317; *Green* v. *Southern Pac. Co.*, 132 Cal. 254 [64 Pac. 255]; *Kenny* v. *Kennedy*, 9 Cal. App. 350 [99 Pac. 384]).''

We think that contributory negligence on the part of the plaintiffs conclusively appears from their own evidence, and that this prevents a recovery by them, even though the same was not specially pleaded. In this connection, it may be observed that the record shows that considerable evidence was introduced by the defendant, without objection, going

to the fact that the driver of the truck was negligent. If it be assumed that the case should have gone to the jury, the court correctly instructed the jury on the subject of contributory negligence. (*Hoffman* v. *Southern Pac. Co.,* *supra.*) We think, however, the evidence does not sustain the jury's finding that plaintiffs were free from such negligence.

The only claim of negligence on the part of defendant is that no warning was given, with perhaps an inference of negligence from the fact that the engineer did not sooner see the truck. The evidence is conflicting as to whether any warning was given by bell or whistle. For the purpose of this decision, we must assume that no such warning was given. This is entirely immaterial, however, since the only possible purpose in giving such a warning would be to attract the attention of the driver of the truck. That he actually saw the engine approaching makes the failure to give such a warning immaterial. The evidence shows the engineer was seated on the right side of the engine; that his seat in the cab was about twenty-five feet from the front of the engine, and that he could not see the truck until it suddenly appeared in front of him, not over thirteen to fifteen feet way. That the engineer could not see the truck is borne out by the testimony of the driver of the truck, who says, he himself, although he was watching the engine all of the time, was not able to see the engineer until just as his truck cleared the south track. Under such circumstances, negligence could not be inferred from the mere fact that the engineer did not see the approaching truck. Nor did the fact that a watchman was not on duty at the crossing at that particular moment relieve the plaintiff from his duty to look and to be governed by what he saw. (*Hutson* v. *Southern California Ry. Co.,* 150 Cal. 701 [89 Pac. 1093]; *Herbert* v. *Southern Pac. Co.,* 121 Cal. 227 [53 Pac. 651]; *Koch* v. *Southern California Ry. Co.,* 148 Cal. 677 [113 Am. St. Rep. 332, 7 Ann. Cas. 795, 4 L. R. A. (N. S.) 521, 84 Pac. 176]; *Heitman* v. *Pacific Elec. Ry. Co.,* 10 Cal. App. 397 [102 Pac. 15].)

Appellant contends that the court committed prejudicial error in giving the jury instructions on the last clear chance doctrine. The court instructed the jury as follows:

"You are instructed that if you find in this case that the plaintiffs' agent had been negligent and the plaintiffs' trailer was, as alleged in the complaint, in front of the train driven by the defendant and the plaintiffs' agent could not extricate himself therefrom by the exercise of reasonable care, *and the defendant had actual knowledge of the plaintiffs' dangerous position,* under the last clear chance doctrine heretofore defined to you, it is the duty of the defendant, if you find it was able by the use of ordinary care to avoid the accident, and if by the use of *the* ordinary care it failed to avoid said accident and you find this to be true in accordance with the other instructions heretofore given and by a preponderance of the evidence, I instruct you that your verdict should be for the plaintiffs." (Italics ours.)

There was absolutely no evidence in the record under which the jury could have found that the defendant had actual knowledge of the plaintiffs' dangerous position in time to have avoided the accident. If the jury's verdict is based upon the instructions as to this doctrine it is not supported by the evidence. In the case of *Bagwill* v. *Pacific Elec. Co.*, 90 Cal. App. 114 [265 Pac. 517, 519], the court says in reference to this doctrine: "The words mean exactly as they indicate, namely, last *clear* chance, not possible chance."

The only evidence as to the amount of damages shows that the trailer was damaged to the amount of $553.60, and that the loss of the use of the trailer amounted to $35, or a total of $588.60. The jury brought in a verdict for $500. While the defendant cannot ordinarily complain that the verdict is for an amount less than it might have been, if there is any evidence at all to sustain the verdict, a verdict may not be sustained which attempts generally to somewhat equalize financial conditions. (*Driscoll* v. *Market Street Ry. Co.*, 97 Cal. 553 [33 Am. St. Rep. 203, 32 Pac. 591].) That would appear to have been the purpose of the jury, in this case, as the record contains no evidence to justify placing the damages at such an amount.

For the reasons herein set forth, the judgment is reversed.

Marks, J., and Strother, J., *pro tem.,* concurred.