[Civ. No. 14867. Second Dist., Div. One. Dec. 31, 1945.]

THOMAS F. DOLTON, Respondent, v. D. C. GREEN et al., Appellants.

Frank Karr, C. W. Cornell, O. O. Collins and Malcolm Archbald for Appellants.

Claude A. Watson, Bernard Brennan and Montgomery G. Rice for Respondent.

WHITE, J.—A rehearing was granted in this case in order that we might give further consideration to appellants' contention that respondent was as a matter of law guilty of contributory negligence proximately contributing to the injuries sustained by him. We therefore adopt as part of our decision that portion of our previous opinion reading as follows:

"This action was instituted by plaintiff to recover damages for personal injuries and property damage allegedly sustained as the result of a collision between a Chevrolet pick-up truck driven by plaintiff and an interurban electric car of the defendant Railway Corporation, which was being operated by defendant D. C. Green.

"By his complaint, plaintiff alleges general negligence in the operation of the electric car. Defendants' answer denies any negligence in the manner in which the electric car was operated and, as an affirmative defense, pleads contributory negligence on the part of the plaintiff.

"The cause proceeded to trial before the court sitting without a jury. By its findings of fact the court determined that plaintiff was free from negligence and that the proximate cause of the accident was the negligence of defendants in the operation of the electric car. Accordingly, judgment was entered in favor of plaintiff against both defendants. A motion for a new trial was denied. From the judgment, defendants prosecute this appeal.

"The accident in question happened about eight o'clock on the morning of March 26, 1942, at the intersection of Venice and National Boulevards, in the city of Los Angeles.

"The record reflects that National Boulevard is a paved street extending north and south of Venice Boulevard. The latter is also a paved street, extending east and west and is a divided highway, the north and south pavements thereof being separated by the right-of-way of the defendant Railway Company. The property of the private right-of-way is 50 feet wide. Two sets of tracks extend along this right-of-way, the northerly tracks being used by westbound and the southerly tracks by eastbound trains.

"By a written stipulation of fact, the nature of the rail operations conducted by defendant Railway Company was thus described: The electric car involved in the accident was engaged in interurban passenger service between Los Angeles and Santa Monica. The rails upon which this operation was conducted extended a distance of 17 miles between the aforesaid points. For about 11½ miles of this total distance, the rails were laid upon a private right-of-way of defendant Railway Company, which was constructed with T rails extending their full height above the ties, the tops of which were level with the ground. Attached to the stipulation is a sketch, from which it appears that for a distance of several miles, both east and west from National Boulevard where the accident occurred, the trains run over a private right-of-way of the Railway Company. Photographs looking along the tracks, both to the east and to the west from National Boulevard, show that the right-of-way extends straight in both directions as far as the eye can see and that there is no obstruction to the view of a motorist looking for approaching trains.

"The paved portions of Venice Boulevard and the right-of-way are separated by cement curbings so that vehicular traffic is excluded from the track area except at road crossings, where the pavement of the road is laid flush with the tops of the rails.

"Venice Boulevard consists of two separate roadways, which lie on each side of the right-of-way. For convenience, they will be hereinafter referred to as the North and South Roadways of Venice Boulevard. Vehicular traffic moves both east and west on each of these roadways. As a result of this construction, there are six entrances to the intersection of Venice

and National Boulevards: two from National and four from Venice. Each of these entrances is posted with a standard boulevard stop sign. A railroad crossarm is located in the southeast corner of the intersection of the right-of-way and National Boulevard, while a standard automatic signalling device, commonly referred to as a wigwag, is located on a pole at the northwest corner of the intersection of the right-of-way and National Boulevard.

"Concerning the circumstances surrounding the collision, plaintiff testified that he had been over this crossing several times prior to the day of the accident and was cognizant of the fact that trains were operated along the tracks. That about eight o'clock on the morning of March 26, 1942, he drove his Chevrolet pick-up truck west on the North Roadway of Venice Boulevard toward National Boulevard. He stopped at the stop sign at National Boulevard and then made a 'broad left-hand turn into National Boulevard across the Pacific Electric tracks.' In making this left turn, he pulled in behind a brown sedan which was going south on National and followed it at a distance of about 15 feet and at a speed of about 10 miles an hour. Plaintiff testified he continued to follow this brown sedan at the same speed until it suddenly stopped for traffic proceeding east and west along the South Roadway of Venice Boulevard. Plaintiff stopped his vehicle about five feet behind the sedan, at which time he was right in the middle of the tracks on which the accident occurred. He further testified that when he stopped on the tracks he looked and observed the electric car which he estimated was then 200 feet away. He further testified that he looked around to see if he could back up but saw an automobile five feet behind him.

"Plaintiff further testified that when he saw the electric car approximately 200 feet away, he formed no opinions as to its speed. The automobile in front of plaintiff remained in the same position up to the time of the collision. Plaintiff testified that the oncoming electric car 'hit me broadside in the center of the right-hand side of my automobile.' Regarding the observations made by him of the approaching electric car, plaintiff testified: 'I saw the train approaching when I made the boulevard stop at the north of stop sign. The train was then beyond the next street which was the average length of a city block west of National Boulevard.' It was stipulated that the average city block is four to five hundred feet in length. After giving a visible sign of his intention to make

a left-hand turn when he was 58 feet from the tracks on which the train was traveling, plaintiff observed it coming toward him. He testified he could stop his truck within 10 to 12 feet and as he was approaching the tracks of defendant Railway Company, he observed traffic moving west on the south side of Venice Boulevard. As we read plaintiff's testimony, it appears that, from the time he observed the electric car when he was stopped on the tracks and the car was some 200 feet distant, he never again looked at it, up to the time of the impact, nor did he at any time form an estimate as to the speed of the approaching car.

"Mrs. Thelma Russell, called as a witness by plaintiff, testified that she was walking south on the west side of National Boulevard some two or three hundred feet north of the tracks. She first observed the Pacific Electric car when it was three or four hundred feet west of National Boulevard. She continued to observe it and estimated that the car was traveling about 50 miles an hour from the time she first saw it until it struck plaintiff's truck. When this witness first saw plaintiff's vehicle it was 'right on the tracks' at the point where the accident occurred. She testified that when she first observed plaintiff's automobile it was proceeding very slowly and suddenly came to a stop; that there was an automobile in front of plaintiff's which was also stopped and an automobile behind him.

"Another witness, J. M. Lee, called as a witness for plaintiff, testified he was riding in a truck which was being driven by another man. The vehicle was headed north on National Boulevard, came to a stop at the stop sign for the South Roadway of Venice Boulevard. When this witness first observed plaintiff's truck it was half way across the set of tracks north of the tracks on which the accident occurred. He first observed the electric car when it was approximately from five to six hundred feet away from the intersection and traveling at a speed of from forty to fifty miles an hour up to the time of the collision. He testified as to the place where the electric car stopped after the collision and it was stipulated the distance was 500 feet east of National Boulevard. This witness denied that any automobile was stopped in front of that of the plaintiff and testified that plaintiff's automobile was moving at the time of the accident. This witness was asked 'To be sure there is no mistake about it, there wasn't any traffic in front of Mr. Dolton that stopped at all?' to which he an-

swered, 'No, they were going this way' (indicating). He was then asked: 'You are indicating that they turned to the right to go west on the south half of Venice?' He answered 'yes.' This witness further testified that he saw only three automobiles going across the tracks, that of plaintiff and two others that were preceding him; that at the time of the accident, the first of the three automobiles had passed the corner and the one immediately in front of plaintiff was just going to turn west and had not quite proceeded on to Venice Boulevard.

"Another witness, Ernest Edward Hall, called by plaintiff, testified that he was the driver of the vehicle in which the preceding witness was riding. He first saw the truck involved in the accident when it was coming south across the northerly set of tracks and when he first saw the electric car it was about 150 feet from the intersection. His estimate of the speed of the car was 50 to 55 miles an hour and he further stated that its speed did not change from the time he first saw it until the impact. He also testified that from the time he first saw the electric car and plaintiff's truck, traffic was going both ways on the South Roadway of Venice Boulevard; that there was an automobile in front of plaintiff's truck which checked its speed because of an automobile making a left turn from the South Roadway of Venice Boulevard into National Boulevard. This witness further testified that there was an automobile following that of plaintiff, but it had not reached the north set of tracks. This witness testified positively that when plaintiff started onto the south tracks where the accident occurred the electric car was about 50 feet away, that plaintiff did not stop on the tracks but merely checked his speed.

"The defendants produced as a witness David Wallace who operated a service station at the northwest corner of Venice and National Boulevards. He testified that his attention was called to the electric car by its whistle, that when he glanced up and observed the car it was 100 to 150 feet west of the intersection; that the whistle ceased for approximately a second and then started blowing in sharp and sudden blasts, at which time he glanced over to the intersection and observed plaintiff's truck just about the moment of the impact.

"John R. Stevenson testified he was the conductor of the electric car, but being on the inside thereof did not see plaintiff's truck before the accident. He testified that as the car

was approaching the crossing, he heard two long and two short blasts of the whistle and that thereafter the motorman continued blowing several short blasts of the whistle. He testified the car had been traveling about 35 miles an hour; that it was slowed down about 300 feet from the crossing to a speed of about 20 or 25 miles an hour by an ordinary service application of the brakes.

"E. A. Knoller, another passenger on the electric car, was seated just behind the motorman in the front seat. He first saw plaintiff's truck going west on Venice Boulevard before it turned left; at that time, the electric car was four or five' hundred feet from the intersection; that he saw the truck enter the intersection; that it turned left and continued to move onto the tracks at a speed of eight or ten miles an hour. This witness testified that there was no traffic in the intersection other than plaintiff's car. He also testified that the speed of the electric car was reduced to 25 or 30 miles an hour when it was 150 feet from the crossing and that he heard the whistle of the car start to blow when it was about 200 feet from the crossing.

"Wayne H. Gillette, another passenger, seated on the second seat from the front on the right-hand side of the car, testified that when he first saw the truck it was headed toward the tracks. That the electric car was about 200 feet from the intersection moving approximately 25 to 30 miles an hour. He continued to watch the truck until it disappeared in front of the train just before the impact; that plaintiff's truck was continuously in motion and going slowly, probably 25, or 30 miles an hour. This witness testified he did not observe any traffic in front of the truck. He heard the whistle of the electric car when the latter was about 200 feet from the crossing and that it continued to blow until the car was a very short distance from the intersection. This witness testified that when the truck drove onto the tracks on which the accident occurred, the electric car was about 40 or 50 feet from the intersection. That he felt a sharp application of the brakes of the train about 50 feet before the impact occurred.

"Claude Green, the motorman of the electric car involved in the accident, testified he first observed the truck when the car was about 200 feet from the intersection. He testified he watched the truck from the time he first saw it until the impact; that it was moving at about 10 or 12 miles an hour when he first saw it, but slowed down slightly when it got near the

west-bound tracks. He testified that when he was about 50 feet from the point of the impact, he concluded the truck was not going to stop; that the train was then traveling about 25 miles an hour, at which time he applied the emergency. He further testified 'I tooted the whistle quick in short snappy blows of the whistle. At the time I applied the emergency brakes the train was traveling approximately 25 miles an hour. I would estimate that the speed of the train was retarded to about 20 miles an hour at the time of the accident.' This witness also testified that he had operated a car of the type involved in the accident for about three years prior thereto; that the grade of the tracks immediately east and west of National Boulevard is just about level; that 'going at a speed of 50 miles an hour on that track I could stop the electric car in about 500 feet by an application of emergency air, at a speed of 35 miles an hour I could stop it in about 350 feet, and at a speed of 25 miles an hour I could stop it between 225 and 250 feet.'' The motorman testified that when the impact occurred, 'something hit me and knocked me out. When I came to, the train was crossing. The brakes are applied and released on the train by an instrument known as the air valve handle. When I came to, this handle was in a released position and I immediately applied brakes into emergency a second time.'

█ ''The rules of caution which govern the conduct of vehicle operators approaching the tracks of an electric interurban system where such tracks are constructed as they were at the point of the accident here in question are the same as the rules which are applied to steam railroad crossings in testing negligence of the party whose conduct is in question. Such was the holding of our Supreme Court in the recent case of *Lund* v. *Pacific Electric Railway Co.*, 25 Cal.2d 287 [153 P.2d 705], in which case, with relation to the highways involved, the construction of the tracks was identical to the physical conditions prevailing in the case now before us. In the cited case, at page 295, the Supreme Court held:

''The law of this state has already been settled adversely to plaintiffs' position. Here the defendant's cars were operated in interurban service upon tracks laid upon a private right of way, rather than upon city streets. Under such circumstances the rules governing their operation, including the traversing of street intersections, are those pertaining gen-

erally to steam or commercial railroads and not those applicable peculiarly to streetcars which use the city streets in common with other traffic. (See *Simoneau* v. *Pacific Electric Ry. Co.* (1911), 159 Cal. 494, 496-501 [115 P. 329]; *Riney* v. *Pacific Electric Ry. Co.* (1919), 45 Cal.App. 145, 148 [187 P. 50]; *Cash* v. *Los Angeles Ry. Corp.* (1935), 6 Cal.App. 2d 738, 740 [45 P.2d 280].)'

"In defining the rights and obligations of vehicle drivers under the conditions with which we are here confronted, it was held in *Bellig* v. *Southern Pacific Co.*, 192 Cal. 357, 362 [219 P. 992], as follows:

" 'In the foregoing cases and in others yet to be cited the rule is that it is the duty of a person approaching the crossing of a suburban railroad being operated outside of the limits of cities, whether the same are steam or electric railroads or are railroads upon which motor-cars propelled by gasoline are being used, to stop and look and listen for such approaching trains or cars and to yield the right of way to such trains or cars. (*Green* v. *Southern Cal. Ry. Co.*, 138 Cal. 1 [70 P. 926]; *Murray* v. *Southern Pac. Co.*, 177 Cal. 1 [169 P. 675]; *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 P. 651]; *Griffin* v. *San Pedro Elec. Co.*, 170 Cal. 772 [L.R.A. 1916A 842, 151 P. 282]; *Thompson* v. *Southern Pac. Co.*, 31 Cal.App. 567 [161 P. 21]; *Basham* v. *Southern Pac. Co.*, 176 Cal. 320 [168 P. 359]; *Simoneau* v. *Pacific Elec. Co.*, 159 Cal. 494 [15 P. 320]; *Loftus* v. *Pacific Elec. Ry. Co.*, 166 Cal. 464 [137 P. 34]; *Heitman* v. *Pacific Elec. Ry. Co.*, 10 Cal.App. 397 [102 P. 15]; *Baker* v. *Southern Pac. Co.*, 184 Cal. 357 [93 P. 765]; *Young* v. *Southern Pac. Co.*, 189 Cal. 746 [210 P. 259, 262].) In the case last above cited the court in applying the foregoing rule to the facts of that case said: "The law presumes that a person possessing normal faculties of sight and hearing must have seen and heard that which was within the range of his sight and hearing. Absent-mindedness or forgetfulness will not suffice as an excuse for the neglect of a person about to cross a railroad track to look and listen for a possible approaching train. And a person who attempts, regardless of warnings, to cross in front of a moving train, even though he be apparently in a condition of mental abstraction and consequently indifferent to the peril of his situation, is nevertheless negligent"; and upon a former appeal of the same case this court, upon the same facts, held that such a person would be negligent as a matter of law. (*Young* v. *Southern Pac. Co.*, 182 Cal. 337, 338 [190 P. 36].)

" 'Turning from the right and duty of persons approaching upon a highway at its intersection with a suburban railroad to the right and duty of the engineer or motorman in charge of such suburban train or car in approaching such intersection, this court has held in numerous and uniform cases that such engineer and motorman has the right to presume that a person thus approaching the crossing of a suburban railway will perform the duty which the law imposes upon him under the foregoing authorities, and in the reasonable exercise of his faculties of observation and caution will not essay such crossing until the danger due to the approaching train or car has passed, *and it has accordingly been held that the operator of such train or car was not bound to check the otherwise rightful speed of his train or car in approaching and passing such crossing until at least he has reason to believe that such person so approaching such crossing is not performing, or is not likely to perform, his duty in the foregoing regard.*' (Emphasis added.)

 "Relying upon the foregoing rules and the authorities supporting them, appellants first contend that the trial court committed prejudicial error in receiving into evidence over their objection certain sections of an ordinance of the city of Los Angeles which regulated operators of streetcars with respect to speed and stopping in obedience to boulevard stop signs.

"The sections of the aforesaid ordinance, which is numbered 77,000 of the Municipal Code of the City of Los Angeles, read as follows:

"Section 80.21:

" ' (a) The Commissioners are hereby authorized to determine those streets and intersections at which traffic is hazardous or dangerous to life or property by reason of the volume of traffic upon such streets or at such intersections, or the lack of visibility of the drivers of vehicles approaching said streets or intersections, or because of the numerous reported accidents or the possibility thereof, or by reason of other physical conditions likely to render any such street or intersection dangerous or hazardous to life or property.

" ' (b) When the Commissioners have determined that a street or intersection is dangerous or hazardous to life or property, they are authorized and empowered to place and maintain, subject to the approval of the Council, stop signs

at or near such of the entrances to said streets or intersections as they shall designate.

" '(c) Every such stop sign shall conform to the requirements of the Vehicle Code.'

"Section 80.22:

" 'When stop signs are erected and maintained pursuant to Section 80.21 or pursuant to any former ordinance or resolution at the entrance to any intersection, every driver of a vehicle and every operator of a street car shall stop at every such stop sign before entering the intersection, except when directed to proceed by a police officer or traffic control signal.'

"Section 80:43:

" '(a) The operator of any street car shall not drive said street car at a speed exceeding the following:

" '1. Fifteen (15) miles per hour when traversing another street car crossing or a highway crossing or when turning upon curves, in either event when the operator does not have an unobstructed view along such intersecting rails or highway or around such curve within a distance of two hundred (200) feet; also when passing schools while persons are entering or leaving the grounds thereof.

" '(2) Twenty (20) miles per hour in business districts.

" '(3) Twenty-five (25) miles per hour in residence districts.

" '(4) Forty-five (45) miles per hour in all other places.

" '(b) The provisions of this section shall not apply when a street car is being operated upon a private right of way which is effectively protected from vehicular traffic.'

"Appellants objected to the introduction of sections 80.21 and 80.22 on the ground, among others not here pertinent, that said sections were 'incompetent, irrelevant and immaterial, having no bearing upon the operation of interburban cars on tracks on a private right-of-way; that if construed as applying to such operation, said sections would be unconstitutional.'

"To the introduction of section 80.43 of the ordinance, appellants objected on the ground that said section was 'wholly immaterial, having no bearing on the facts at issue for the reason that said section was not applicable to the operation of electric trains upon a right-of-way such as was involved in the case at bar.'

"The objections were overruled and each of the foregoing

sections of the ordinance was received in evidence. The ruling was erroneous. The provisions of the ordinance are limited in scope to the operation of *streetcars*. A streetcar is defined in Webster's New International Dictionary, second edition, as 'a car, usually a passenger car, running through the public streets.' The same authority defines a street railway as 'a street car line.' In *Piedmont Cotton Mills* v. *Georgia Ry. & Elec. Co.*, 131 Ga. 129 [62 S.E. 52, 58], the court states:

" ' "Street cars," accurately speaking, are cars which traverse the streets of a town or city, and carry passengers, who get on and off at various points along the line. They have been considered as vehicles of street travel, . . .' "

"It is therefore the nature and location of the tracks rather than the character of the particular car that is running upon the tracks that determines the applicability of the ordinance. Respondent directs our attention to the fact that the car here in question is 'of the type which customarily functions in local traffic'; 'would stop at any corner on signal'; but, as pointed out in *Simoneau* v. *Pacific Electric Ry. Co.*, 159 Cal. 494, 501 [115 P. 329], if the test were not the location and nature of the tracks rather than the character of the particular car, very little protection would be afforded the public by these safety ordinances, because interurban trains would be exempt from the ordinance when operating upon tracks which are laid upon public streets, that is to say, streets from the use of which as a public highway the public is not excluded. There can, therefore, be no doubt, applying the foregoing test, that insofar as the track was laid along the private right-of-way in such manner as to exclude the general public from the use of any part of the right-of-way, such track was not a street railway track and the car operated over such right-of-way was not a 'street car' in contemplation of the ordinance. Nor does the fact that the private right-of-way was intersected at intervals by public highways devoted to vehicular traffic, at which intersections the track is laid flush with the street so that vehicles might cross the track on such street, convert this part of the track into a street railway track. ██ As was said in *Simoneau* v. *Pacific Electric Railway Co.*, *supra*, at page 500:

" ' 'The respondent draws attention to the fact that, for the width of 38th Street the track was laid flush with the surface so that passengers and vehicles might cross on the street. It cannot be said that this part of the track was thereby con-

verted into a street-railway track. A street-railway, as we have seen, is one running along a public street, not across one. To adopt the contention of the respondent in this regard would mean that the track of every commercial or steam railroad which, in entering the city of Los Angeles crossed any street, became to the extent of the width of such street a street-railway track. This is obviously not the intent of the ordinance.'

█ ''Upon the authority of *Simoneau* v. *Pacific Electric Railway Co., supra,* and *Lund* v. *Pacific Electric Railway Co., supra,* it must be held that when the ordinance speaks of street cars it has reference to cars operated on rails along and upon the streets of the city of Los Angeles and not to cars or trains of cars operated on a private right-of-way which at intervals merely cross a street. Had the drafters of the ordinance intended otherwise, it would have been easy and simple to so provide (*Lund* v. *Pacific Electric Railway Co., supra,* at page 306). To us it is clear from the record that, at the time and place with which we are here concerned, the electric car was being operated as part of an interurban rapid transit system between Los Angeles and Santa Monica and not as a street car. Hence, the admission of the aforesaid ordinance into evidence was error. █ Respondent urges that appellants cannot now complain of the introduction of the ordinance into evidence because they failed to make a motion to strike the same. It is only where the evidence is apparently admissible and no motion is made to strike it when the contrary is shown that an objection to its admissibility is deemed to have been waived, but where, as here, the challenged evidence was obviously inadmissible at the time it was offered and appropriate objection was made to its introduction, a subsequent motion to strike is not necessary to preserve the error on appeal (*Ballos* v. *Natural,* 93 Cal.App. 601, 608 [269 P. 972]; *Nakamura* v. *Los Angeles Gas & Electric Corp.,* 137 Cal.App. 487, 490 [30 P.2d 1022]). █ The error complained of requires a reversal of the judgment because we cannot say what weight and influence the improper evidence had upon the trial court in framing its findings of fact wherein it determined that respondent was free from negligence and that appellant motorman was guilty of negligence which proximately contributed to respondent's injuries (*Davis* v. *Robinson,* 50 Cal.App.2d 700, 705 [123 P.2d 894]).''

█ Finally, appellants contend that respondent must be held guilty of negligence as a matter of law. In that regard,

respondent's actions must be viewed in the light of the standard of conduct required of persons operating vehicles at railroad crossings. In numerous cases it has been held to be the duty of a motorist approaching a railroad crossing not only to stop, look and listen, but when, having done so, he actually sees the approaching danger it then becomes his duty to note the speed at which the train or car is approaching, and if the latter is within such a distance and going at such an apparent rate of speed as to cause a reasonable apprehension of danger, it is negligence on the part of the driver to attempt to make the crossing.

Respondent testified that he stopped at the stop sign at National Boulevard, where he observed the approaching car, which was then from four to five hundred feet distant. He then made a "broad left-hand turn into National Boulevard across the Pacific Electric tracks." Respondent testified that he again saw the oncoming electric car as he was making his left turn some 58 feet from the point of the accident. The spot at which respondent made the left turn was designated as "D-2" on the map at the trial. That he never again looked for the car from the time he made his left-hand turn 58 feet from the crossing until he had stopped on the tracks, is shown by the following testimony given by him:

"Q. And the train was still moving when you saw it at D-2, wasn't it? A. Yes.

"Q. Did you estimate then how fast it was traveling? A. No, sir.

"Q. Did you try to form any opinion as to how fast that train was coming? A. No, sir.

"Q. Did you see the car again from the point D-2 until, as you say, you had stopped on the track? I mean the train. A. No, sir.

"Q. You never did look at it again?

"Q. You answered 'No'; is that right? A. Yes."

It must be conceded, under the law enunciated in countless cases, that respondent was remiss in his duty in not observing the approaching danger at any time during the last 58 feet of his approach to the tracks. According to respondent's testimony, the next time he observed the train was when he stopped on the track. In that regard he testified as follows:

"Q. Where was your car when you next definitely observed the Pacific Electric car? A. After I got over onto

the other track, and I was stopped, it was still 200 feet down the track, fully 200 feet."

Respondent also testified that during the time he was moving from point D-2, 58 feet from the tracks, up to the point of the accident, he noticed that traffic was proceeding west across National Boulevard on the south side of Venice Boulevard; that as he approached the tracks from point D-2 he was traveling at a speed of ten to twelve miles per hour "and could stop the pickup within ten or twelve feet with a good application of the brakes."

As respondent made his left-hand turn into National Boulevard some 58 feet from the tracks, he was behind another vehicle described by him as "a big brown sedan." He "followed right along behind it at a speed of about ten miles an hour. It did not change its speed at any time until it made a sudden stop in front of me." Respondent testified that when the brown sedan suddenly stopped in front of him, he "stopped, to keep from running into the back end." At that time respondent was "right in the middle" of the track upon which the accident occurred. From the testimony it appears that the vehicle in front of respondent stopped suddenly to permit the passing of traffic moving in both directions on the south roadway of Venice Boulevard. Concerning his conduct when he stopped upon the railroad tracks respondent testified: "There was an automobile following me at the time I stopped on the tracks. I first observed the automobile following me when I saw I was right on the track. I looked and saw the street car 200 feet away, and I looked back to see if I could back off, and there was an automobile stopped about five feet behind me. I don't know if it backed up or moved before I was struck, and I did not observe where this automobile came from. The first time I saw it was when I turned around to see if I could back off the tracks."

In support of his claim that he was free from negligence respondent urges that when he entered the intersection "every such vehicle which thereafter entered from any one of the five possible approaches to the intersection must wait until he had cleared its proposed path before it could proceed. He had a complete right to rely upon this rule and to rely upon the probability that every driver or motorman would expect him to rely upon the rule. . . . He had a right to assume that the motorman, even if he did not stop at that other intersection, would so control his car as to afford intersection priority

to cars then actually in this intersection." This argument, however, overlooks the fact that under the rule with respect to the duty of a person approaching the track of an electric railway being operated under conditions similar to a railroad, he must upon approaching the crossing give way to the car, if necessary, to avoid a collision. (*Arnold* v. *San Francisco-Oakland T. Rys.*, 175 Cal. 1 [164 P. 798].) The rule is thus stated in *New York L. Oil Co.* v. *United Railroads,* 191 Cal. 96, 101 [215 P. 72]: "It was the duty of the driver of the truck to note the speed at which the electric car was approaching the crossing, and if, when the driver of the truck last looked at the approaching car, it was within such a distance and going at such an apparent rate of speed as to cause a reasonable apprehension of danger, it was undoubtedly negligence on the part of the driver to attempt to make the crossing. (*Martz* v. *Pacific Electric Ry. Co., supra,* (31 Cal.App. 592 [161 P. 16]).)"

In the instant case, as heretofore noted, respondent testified that he never looked toward the approaching electric car from the time when he was in a position of safety as he made his left-hand turn 58 feet from the crossing until he had stopped on the tracks. Thus the conclusion seems inescapable, from the uncontradicted evidence as just outlined, that the driver of the pickup truck, although fully aware of the approaching car when 58 feet away from the tracks, closed his eyes to the danger necessarily involved in any attempt to cross the tracks and continued to drive his truck into the path of the oncoming car.

Respondent, however, contends that when he made his left-hand turn 58 feet from the tracks he entered a line of moving traffic behind a brown sedan which was following another vehicle, and both of which stopped, thereby depriving him of freedom of action, in that he could not go forward without crashing into the automobile ahead of him and could not go backward because of the presence of another vehicle to his rear. While it is true that respondent could not go backward because of the presence of another vehicle "about five feet behind me," he could nevertheless have stopped his truck at any time before he went upon the tracks. He was traveling at a rate of speed of from ten to twelve miles per hour and, according to his own testimony, could have stopped his vehicle within ten or twelve feet. The situation here presented is not

one where without negligence on his part a vehicle driver finds himself in a position where the circumstances suddenly confronting him may excuse his failure to follow the law and wherein what a reasonable person might do under similar circumstances is not so clear but that reasonable minds might differ on the question. In the case with which we are here concerned the physical facts shown by the undisputed evidence raise the inevitable inference that respondent admittedly not only could see but did see the electric car approaching when he was in a position of safety 58 feet from the tracks; that he failed to again look in the direction of the approaching danger or pay any attention thereto before he reached a hazardous position on the track; that at any time before he drove on to the tracks he could have stopped his truck within a distance of 10 or 12 feet; that he was also aware of the traffic proceeding east and west on the south side of Venice Boulevard and that such westbound traffic might, as it did, cause the vehicles in front of him to stop. The evidence shows that although respondent had an unobstructed view of the tracks and the car approaching thereon for the last 58 feet, he still continued to drive up to and upon the tracks in the face of the approaching car, and that during the time just mentioned he neither judged the speed of the car nor looked toward it to see what effect its approach to the intersection might have upon his safety. With this picture, respondent must be held as a matter of law to be guilty of contributory negligence, unless we would disregard and overrule a long line of California cases involving accidents at railway crossings. (*New York L. Oil Co.* v. *United Railroads, supra; Gundry* v. *Atchison, T. & S. F. Ry. Co.*, 104 Cal.App. 753 [286 P. 718]; *Martz* v. *Pacific Elec. Ry. Co.*, 31 Cal.App. 592 [161 P. 16]; *Dull* v. *Atchison, T. & S. F. Ry. Co.*, 27 Cal.App.2d 473 [81 P.2d 158]; *Argo* v. *Southern Pac. Co.*, 39 Cal.App.2d 706 [104 P.2d 77]; *Glickman* v. *Pacific Elec. Ry. Co.*, 54 Cal.App.2d 454 [129 P.2d 132].)

For the reasons herein stated, the judgment is reversed and the cause remanded with directions to the court below to enter judgment for defendants.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied January 21, 1946.