[Civ. No. 186. Fourth Appellate District.—January 16, 1931.]

ARTHUR CARR, Appellant, v. W. S. KINGSBURY, as Chief of the Division of State Lands, etc., Respondent.

Head, Wellington & Jacobs, I. B. Dockweiler, John Dockweiler, Roy Maggart, George H. Bush and Philip C. Farman for Appellant.

U. S. Webb, Attorney-General, and H. H. Linney and John W. Maltman, Deputies Attorney-General, for Respondent.

L. W. Blodgett, City Attorney, as *Amicus Curiae* in Support of Appellant.

William A. Barnhill, Hubert T. Morrow, James S. Bennett, Frank G. Finlayson and Finlayson, Bennett & Morrow, as *Amici Curiae* in Support of Respondent.

MARKS, J.—Appellant filed this petition in the court below seeking a peremptory writ of mandate to compel respondent to issue a permit or lease to prospect oil and gas under the provisions of an act of the legislature approved May 25, 1921 (Stats. 1921, p. 404), on certain tide, overflowed or submerged lands in the city of Huntington Beach, California. For brevity we will hereafter refer to this act as the Leasing Act. In each of the briefs originally filed all of the respective counsel agreed that the sole question to be determined upon this appeal was whether or not respondent was justified in refusing to issue the permit under that provision of section 4 of the Leasing Act, which is as follows: "Provided further, however, that in no case shall permits or leases be granted covering tide, overflowed or

submerged lands. fronting on an incorporated city, or for a distance of one mile on either side thereof.'' It was also agreed that appellant had taken all of the steps necessary leading up to the granting of the permit or lease. At the argument, and now in supplemental briefs filed, it is urged that the provision of the Leasing Act which we have quoted is unconstitutional.

The city of Huntington Beach is a municipal corporation of the sixth class in Orange County, California. Its westerly boundary line is three miles out in the ocean from the coast line and corresponds with the westerly boundary line of the state of California (Const. Cal., art. XXI). The property upon which appellant seeks a lease is rectangular in shape, having a width of thirteen hundred and twenty feet and a length of thirty-three hundred feet. It extends from the line of mean high tide along the coast line, southwesterly for its length into the ocean. Its northwesterly line is approximately sixty-eight hundred and eight feet southeasterly from the northwestern city limits. A municipal pleasure pier of the city of Huntington Beach is constructed oceanward from the land at a point approximately thirty-eight hundred and ninety feet southeasterly from the southeasterly line of the location claimed by appellant. The business and residential portion of the city extends shoreward from the pier and centers on Main Street, which ends at the foot of the pier. The land to the shoreward of appellant's location is occupied exclusively by oilwells and oil-well rigs, machinery and equipment. It was formerly fairly well covered with dwellings which were removed to make way for drilling operations. The dwellings now commence above the shore line a short distance southwesterly from the Carr location.

The proviso of the Leasing Act which we must construe divides itself into two portions, the first of which provides in effect that no permits or leases shall be granted by the state covering tide lands, overflowed lands, or submerged lands fronting on an incorporated city; and the second, that no permits or leases shall be granted covering such lands for a distance of one mile on either side of such city. The second portion of the proviso has been construed in the case of *Joyner* v. *Kingsbury*, 97 Cal. App. 17 [275 Pac. 255]. We will, therefore, not consider it here except in so

far as may be necessary to determine the public policy of this state as declared by the legislature in the Leasing Act and acts amendatory thereof.

Tide lands are generally defined as those over which the neap or ordinary tide regularly ebbs and flows. Submerged land, as the term was used in the Leasing Act before the amendment thereof in 1929 (Stats. 1929, p. 944) and as applied to this case, must be held to mean that part of the ocean bed not uncovered by the tides. Overflowed lands, if there can be any such in connection with the ocean, must be said to be that portion of the shore line and sand bars which are not uncovered by the neap or ordinary tides, but which appear above the water during the spring tides, which occur twice each month, or during the high spring tides which happen during the equinoxes. Whether or not any of the property involved here properly can be denominated as overflowed lands seems unimportant in this case and we will assume that it was composed of tide lands, and submerged lands only.

■ Primarily it is the duty and function of the legislature to declare the public policy of the state, and it may do so within the limitations provided by the Constitution, and the principles underlying and recognized by the Constitution and laws. (*Lux* v. *Haggin*, 69 Cal. 255 [4 Pac. 919, 10 Pac. 674]; *Southern Pac. Co.* v. *Stibbens*, 103 Cal. App. 664 [285 Pac. 374]; *Maryland Casualty Co.* v. *Fidelity & Casualty Co.*, 71 Cal. App. 492 [236 Pac. 210].) Therefore we must look to the provisions of the Leasing Act itself to determine the public policy of the state in regard to the drilling of oil-wells along the beach fronting the shore line of an incorporated city.

In a great majority of municipalities having an ocean frontage the line of mean high tide forms their ocean boundaries. It was stated in the argument of this case that the city of Huntington Beach is the only municipality in California with boundaries extending over the bed of the ocean. While this statement was not denied we have not verified it. If it be true, the case before us presents the only instance in California in which a similar question could be presented.

■ In 1921 the legislature passed the Leasing Act which we are considering. By its terms all minerals in the

public domain were reserved to the state. It contained the proviso, which we have quoted, and because of the tide water boundary line of the great majority of our coastal cities this proviso discloses the trend of the legislative mind toward the reservation of municipal beaches free from mining operation for the enjoyment and recreation of the people of the state. In 1923 the act was amended by the legislature which attempted to give the surveyor-general a discretion in granting permits or leases which would have further restricted drilling operations on the coastal tide and submerged lands. A portion of this amendment was declared unconstitutional in the case of *Boone* v. *Kingsbury,* 206 Cal. 148 [273 Pac. 797], because its provisions were not contained in the title of the act or of the amendatory act. Its passage, however, shows an intention on the part of the legislature to place additional restrictions upon ·drilling for oil on tide or submerged lands. In 1929 the legislature again amended the Leasing Act and added three new sections to it which prohibited the receiving of any application for a permit or lease after September 1, 1929, and the issuing of any such permit or lease after such date, except that "nothing contained in this section shall be deemed or construed with reference to the holder of a valid, uncanceled and unforfeited prospecting permit granted upon an application filed in full accordance and compliance with the provisions of this act on or prior to January 17, 1929" (Stats. 1929, p. 945). These enactments show the legislative mind progressed from the intention to limit the drilling of oil wells on tide and submerged lands fronting on coastal cities in 1921 to the determination to declare a public policy which would prevent the removal of all hydro-carbons from such lands along the entire coast of the state when the right so to do had not already accrued.

The word "front" is defined in Webster's International Dictionary as "The beginning, . . . land which faces or abuts on a piece of water." The same authority defines "fronting"—"To oppose face to face, to oppose directly." "Fronting" is defined as "adjoining, touching. Phrases: fronting, adjoining or abutting on". (27 Cor. Jur. 910.) Property described in a mortgage as having a certain front to a river has been held to have a riparian estate bordering upon the river. (*La Branch's Heirs* v. *Montegut,* 47 La.

Ann. 674 [17 South. 246].) The words "fronting" and "adjoining" have been held synonymous. (*Meier* v. *City of St. Louis*, 180 Mo. 391 [79 S. W. 955].) The phrase referring to lots "fronting upon a street" means the lots touching the boundary line of the street. (*Flynn* v. *Chiappari*, 191 Cal. 139 [215 Pac. 682].)

Applying these definitions to the phrase under consideration where the legislature referred to the "tide, overflowed or submerged lands fronting on an incorporated city" we conclude that it meant to refer to the line where these lands touch the uplands of the city. We find the uplands of the city touched first by the tide lands. The tide lands are defined on the upland side by the line of the neap or ordinary high tides, and on the ocean side by the line of the same low tides. Omitting from consideration as unnecessary, overflowed lands, we have next adjoining the tide lands oceanward the submerged lands that are not uncovered by the tides. The westward boundary of the uplands of the city is the line of neap or ordinary high tides, and the shoreward boundary of the submerged land is the line of the same low tides. We therefore have the tide lands "fronting on" (touching) the incorporated city at the line of the neap or ordinary high tides, and the submerged lands "fronting on" (touching) the incorporated city at the line of the neap or ordinary low tides. We believe that any other construction placed upon this language would do violence to the intention of the legislature as expressed in the Leasing Act and would be contrary to the public policy which it announced in its legislative enactments. It must be borne in mind that the legislature did not provide that the permits or leases should be granted covering tide or submerged lands fronting on the *exterior boundaries* of an incorporated city. To adopt the construction of the act urged by appellant we would have to read these words into it. He contends that the permits may be granted on tide, overflowed or submerged lands within the city limits and not in an area one mile wide and three miles long outside of such limits. The effect in this case of such an interpretation of the Leasing Act would be to prohibit the leasing of the tide, overflowed or submerged lands one mile in width lying along and adjoining and outside of the northerly and southerly city limits of Huntington Beach,

and permit the leasing of such lands on 'both sides thereof. We do not believe that such a construction is warranted by the language of the Leasing Act nor is it in accord with the intent and purpose of the legislature in passing it.

If the theory of appellant were adopted there would be no tide lands in Huntington Beach to which the terms of the Leasing Act would be applicable as the city limits extend three miles into the ocean. Tide lands are made such by the water of the ocean flowing over them. Submerged lands are made such by the water standing over them. Their lines of meeting with the shore make their points of contact with the city. Under the theory of appellant the use of the term ''tide lands'' would be meaningless, useless and without application in this case.

██ ''It is the well settled rule of law in this state that the courts will construe a statute so as to give it full force and effect as far as is possible so that it may stand in its entirety. (*Kydd* v. *San Francisco,* 37 Cal. App. 598 [174 Pac. 88] ; *Hunt* v. *Manning,* 24 Cal. App. 44 [140 Pac. 39].) If the language will reasonably permit, a construction will be given statutes which will sustain and render them valid and operative rather than defeat them. (Sec. 3541, Civ. Code; *Glassell Dev. Co.* v. *Citizens' Nat. Bank,* 191 Cal. 375 [28 A. L. R. 1427, 216 Pac. 1012] ; *Cuthbert* v. *Woodman,* 185 Cal. 43 [195 Pac. 673].)'' (*Chilson* v. *Jerome,* 102 Cal. App. 635 [283 Pac. 862].) It happens that the tide lands are within the exterior boundaries of the city of Huntington Beach, but the fact remains that they are there. It is our duty to give effect to all the provisions of the Leasing Act and if we can do so without doing violence to its clear language we must carry out and give effect to the intention of the legislature in passing it. We believe that the legislature intended to have the Leasing Act apply to all cities alike and that when it used the term ''tide lands'' in the act, it referred to all such tide lands whether inside or outside of the exterior boundaries of the city and in using the phrase ''fronting on an incorporated city'' it referred to the line where these tide lands touched the balance of the incorporated city whether inside or at the outside of the exterior corporate boundaries thereof. The same may be said of its use of the term ''submerged lands'' in this act.

o

The land phrase of the proviso we have been considering, namely, "or for a distance of one mile on either side thereof", has been construed in the case of *Joyner* v. *Kingsbury, supra*. The facts in the Joyner case are identical with those of the instant case except the dates of filings and the description of the property which lies thirty-nine hundred and sixty feet northwesterly from the Carr location. An application to have that case heard in the Supreme Court after judgment in the District Court of Appeal was denied by the Supreme Court on April 25, 1929. We are aware of the rule announced by the Supreme Court that the denial of a petition for hearing by it does not approve the rules of law announced by the District Court of Appeal in its decision, but we do feel that such action by the Supreme Court should be construed by us as an approval of the ultimate decision of the District Court of Appeal in that case. In view of the identically similar facts and questions of law presented for decision in the two cases, and the ruling of the Supreme Court on the petition for hearing in the Joyner case, we believe that case should be followed by us in the instant case.

During the oral arguments of this case appellant urged that the proviso in question is unconstitutional and void, first, because its subject matter is not embraced within the title to the act, and second, because it is legislation applying to a special class and clearly discriminatory. We cannot agree with either of these contentions. The following authorities support our conclusions as to the first contention: *Estate of Wellings,* 192 Cal. 506 [221 Pac. 628]; *Ex parte Liddell,* 93 Cal. 633 [29 Pac. 251]; *Ex parte Hallawell,* 155 Cal. 112 [99 Pac. 490]; *People* v. *Jordan,* 172 Cal. 391 [156 Pac. 451]. It is too well settled law to need the citation of authorities that an act is considered general in its effect if it applies to all cities, counties or persons within a well-defined class. The proviso in question applies to all cities fronting on tide, overflowed, or submerged lands whether such lands be in the ocean or in the lakes or rivers of the state. Because but few of such cities now have proven oil-fields within or near their exterior boundaries cannot be controlling in this case. Neither counsel nor this court can prophesy where or when the drill will find productive oil sands in fields unknown at the present

time. Twenty years ago no one had the temerity to drill for oil in the now proven fields of Huntington Beach.
Judgment affirmed.

Barnard, P. J., and Warmer, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 11, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 16, 1931.