[L. A. No. 18172. In Bank. Aug. 3, 1943.]

E. C. DENIO et al., Respondents, v. THE CITY OF HUNT-
INGTON BEACH, Appellant.

582

Drumm, Tucker & Drumm and Ray H. Overacker, City Attorney, for Appellant.

Forgy, Reinhaus & Forgy for Respondents.

SCHAUER, J.—Defendant city of Huntington Beach appeals from a judgment, based on a jury verdict, awarding to plaintiffs $2,000 as attorneys' fees for services rendered to defendant under a written contract between the parties. After plaintiffs had partially performed the services called for by the contract, defendant city discharged them. The city now seeks to justify such discharge on the ground that the contract was ultra vires and void in its inception, and on the further ground that plaintiffs had abandoned the contract prior to such discharge. The city also asserts that plaintiffs have not shown that it has received the particular fund, or the precise amount thereof, from which plaintiffs were to be paid. We have concluded, however, that upon the record none of defendant's propositions is tenable and that the judgment must be affirmed.

The terms of the contract, set forth in a letter from plaintiffs to defendant, are in material part as follows:

"The firm of Denio, Hart, Taubman & Simpson will act as special counsel for the City of Huntington Beach in cooperation with your City Attorney in:

"(a) The preparation of a freeholders' charter for submission to the electors of the City of Huntington Beach for adoption or rejection as soon as reasonable possible.

"(b) In all suits and legal matters in connection with your proposed efforts to obtain the City's *just control and returns from the oil, gas or other hydrocarbon substances claimed by*

*it* or to which it is entitled, in the tide or overflow lands within the City boundaries of the City of Huntington Beach.

"For the above services we are to receive the following compensation:

"1. A retainer of Twenty-five Hundred Dollars ($2500.00) in cash upon the execution hereof, which shall be, in case no recovery is had as hereinafter specified, in full for all legal services rendered or to be rendered in the above, exclusive of court costs, filing fees, printing, traveling and hotel expenses.

"2. If a recovery is had by the City of Huntington Beach, *either by a Court decision or by a compromise or settlement of the City's claims,* we are further to be paid out of all moneys paid to the City of Huntington Beach as royalties, or received by it out of the sale of its oil, gas or other hydrocarbon substances, if its royalties are paid to it in kind, the following:

"Ten Per Cent (10%) of the moneys so received by the City for the first two (2) years;

"Fifteen Per Cent (15%) of the moneys so received by the City for the next three (3) years;

"Twenty Per Cent (20%) of the moneys so received by the City for the next ten (10) years.

"The above payments to commence with the first returns paid to or received by the City of Huntington Beach on account of royalties, as above.

"In computing the above periods of percentage payments, the time during which the City does not receive royalty payments, directly or indirectly, either in money or in kind, shall be excluded.

"Payments to be made to this firm within ten (10) days after receipt by the City of its royalties.

"It is understood, of course, that your City Attorney will be in charge of all litigation, and that all compromises, if any, will be subject to his approval and to the approval of your Honorable body." (Italics added.)

The contract was executed on behalf of the city by its mayor and city clerk, by direction of its council, stated in its Resolution No. 769, adopted March 1, 1937, the $2500 retainer fee was paid to plaintiffs, and they entered upon the performance of their obligations under the contract.

The parties continued under their contractual relationship until August 29, 1938, when the defendant's city council adopted its Resolution No. 814, as follows:

"That that certain Resolution No. 769 entitled: 'Resolution of the City Council of the City of Huntington Beach, California, Employing Special Counsel', be and the same is repealed and the contract therein referred to is hereby cancelled and the said attorneys are hereby discharged."

By a letter to plaintiffs dated October 6, 1938, the city attorney of Huntington Beach notified plaintiffs of the adoption of the above resolution. Plaintiffs replied as follows, by a letter dated October 8, 1938:

"This day we received a letter from your City Attorney referring to the action taken August 29, 1938 by the City Council of the City of *Long Beach* by Resolution No. 814.

"This is to inform you that we remain, as at all times we have been, ready, able, and willing to proceed and perform all services under our contract of employment with the City of Huntington Beach, as special counsel for said city for the purposes, and upon the conditions and compensation set forth in our said contract of employment. *We do not concede your right to terminate our right to the compensation set forth in said contract,* and we do not consent to any purported termination of the contract or our rights thereunder. We will continue to hold ourselves ready to act as special counsel for the City of Huntington Beach in cooperation with your City Attorney in all suits and legal matters in connection with the matters and things referred to in said contract or relating thereto, *and will expect to receive the compensation therein provided.*" (Italics added.)

At the time of the execution of the contract here involved (March 1, 1937), Huntington Beach was a city of the sixth class; shortly thereafter its citizens adopted a charter which became operative on May 15, 1937 (Stats. 1937, p. 2975). The city's uplands lie northeasterly of, and adjacent to, the line of mean high tide of the Pacific Ocean. Its southwest boundary parallels that line and is distant three miles (out in the ocean) from it (corresponding with the southwest boundary line of the State of California). (*Carr* v. *Kingsbury,* (1931) 111 Cal.App. 165 [295 P. 586].) The charter declares that the boundaries shall continue to be the same as before the charter was adopted. (Art. II, Charter; Stats. 1937, pp. 2975, 2977.) A controversy had arisen between the city and the State of California as to their respective rights to extract oil from the so-called "tide and overflow lands" within the city

boundaries, and over royalties from wells which might be whipstocked into such lands from surface locations on the uplands bordering the ocean. (See *Carr* v. *Kingsbury, supra*; *Joyner* v. *Kingsbury* (1929), 97 Cal.App. 17 [275 P. 255].)

Defendant city, as one of the claimants to the oil, in 1934 had entered into an oil lease with the Southwest Exploration Company, whereby it was attempted to give that company the right to drill for and remove oil from the tide and overflow lands mentioned hereinabove. Such lease reserved a one-sixth royalty to the city. The area described in the lease is bounded on the northeast by the line of mean high tide, on the northwest by the northwest boundary of the city which extends three miles into or over the ocean, on the southwest by the southwest boundary of the city (which parallels the shore line, three miles out in the ocean), and on the southeast by the southeast line of Twenty-third Street extended over the ocean. However, apparently because the company doubted the city's right to the oil under this area, no development work was done under that lease.

Ocean Avenue is a public street of the city of Huntington Beach, 100 feet wide, and parallels the shore line a few hundred feet distant from it. The city claims that it owns this street in fee (see *Marshall* v. *Standard Oil Co.* (1936), 17 Cal.App.2d 19 [61 P.2d 520]), and that it therefore has the right to prevent the whipstocking of oil wells from the landward side of the street, under its surface and thus into the oil sands underlying the tidelands.

By a document entitled "Agreement for Easement No. 392," dated September 26, 1938, the State of California purported to grant to the Southwest Exploration Company the right to drill into the tidelands area hereinabove described, from surface locations on uplands in the city of Huntington Beach lying northeasterly of the described area; i.e., northeasterly of the mean high tide line.

Under date of November 3, 1938, the city of Huntington Beach and the Southwest Exploration Company entered into a contract entitled "Agreement and Easement for Right of Ways." This contract reads, in part, as follows:

"WHEREAS, . . . under date of the 26th day of September, 1938, the State of California . . . did by . . . 'Agreement for Easement No. 392 . . .' grant to Southwest an easement through, in and under certain lands . . . together with the right to . . . take . . . oil, gas, and other hydrocarbon sub-

stances through oil wells to be drilled . . . from the uplands, and

"WHEREAS, Southwest is now drilling certain oil wells into the lands described in said Agreement . . ., and

"WHEREAS, Huntington Beach has claimed and now claims to be entitled to the payment of certain monies from Southwest and to certain royalties by reason of any operations of Southwest under . . . said Agreement for Easement No. 392 . . ., which said claim is disputed and denied by Southwest, and,

"WHEREAS, . . . under date of the 4th day of October, 1934, the parties hereto did enter into a certain agreement in writing entitled 'Oil and Gas Lease' . . ., the lands described in said Oil and Gas Lease being *generally coextensive with the lands described in said above mentioned Agreement for Easement No. 392,* and Southwest has questioned and now questions the right, power and authority of Huntington Beach to enter into said Oil and Gas Lease, and

"WHEREAS, the parties hereto have never operated under said Oil and Gas Lease, and do not now contemplate operations thereunder, except as hereinafter provided,

"NOW THEREFORE, *in order to settle and compromise the claims of Huntington Beach to the payment of monies and royalties to it by Southwest,* and in full settlement and satisfaction thereof, it is understood and agreed as follows:

"1. Upon the due execution and delivery of this agreement, Southwest agrees to and has herewith paid to Huntington Beach the sum of Twenty-five Thousand Dollars ($25,-000.00) lawful money of the United States, receipt of which is hereby acknowledged.

"2. Southwest further agrees to pay to Huntington Beach monthly a sum equal to two per cent (2%) of one hundred per cent (100%) of the gross amount received by Southwest from the sale of one hundred per cent (100%) of all the oil, gas and other hydrocarbons produced, saved and sold by Southwest during the preceding calendar month from the lands described in the above mentioned Agreement, said payments to be made on the 20th day of each month until, in addition to the monies provided for in paragraph 1 hereof, there has been paid to Huntington Beach the further sum of One Hundred Fifty Thousand Dollars ($150,000.00).

"3. After Southwest shall have paid to Huntington Beach

the total sum of One Hundred Seventy-five Thousand ($175,-000.00) Dollars, in the manner and at the times provided in paragraphs 1 and 2 hereof, Southwest shall pay to Huntington Beach monthly a sum equal to two per cent (2%) of the total royalties paid to the State of California by Southwest pursuant to the provisions of the above mentioned Agreement for Easement No. 392 ... .

"4. . . . Notwithstanding anything to the contrary herein contained, it is expressly understood and agreed that payments of monies provided for in paragraphs 2 and 3 hereof shall apply only to wells, the producing intervals of which are located in whole or in part in lands within the confines of the city limits of Huntington Beach, extended vertically downward, regardless of the location of the derrick or other surface structures.

"5. In so far as Huntington Beach has any interest in or to that certain . . . parcel of land . . . which lands are generally known as Ocean Avenue . . ., Huntington Beach does hereby grant to Southwest any and all easements and right of ways into, under and through said lands necessary or convenient or deemed by Southwest to be necessary or convenient to its operations under the provisions of the above mentioned Agreement for Easement No. 392.

"6. It is specifically understood and agreed that the payment of monies made by Southwest to Huntington Beach pursuant to paragraphs 1, 2, 3 and 4 hereunder shall not be considered or regarded as being made pursuant to any obligations imposed upon Southwest by the provisions, terms, covenants and conditions of the above mentioned Oil and Gas Lease dated the 4th day of October, 1934 between the parties hereto, or any other agreements heretofore made with said City, . . .

"7. In the event that either by the final decision of a court of competent jurisdiction or by the terms of a compromise agreement it shall be determined that Huntington Beach is the owner of the oil, gas and other hydrocarbon substances within and underlying the tide and submerged lands lying within the city limits of the City of Huntington Beach, including the above mentioned lands, then the Oil and Gas Lease dated October 4, 1934, shall become effective and the parties hereto shall thereafter operate thereunder and in accordance with the provisions thereof, and Southwest shall

pay to Huntington Beach the royalties therein contained, provided further that any monies paid to Huntington Beach by Southwest hereunder shall be applied in partial or total payment and satisfaction of the monies provided for in paragraph 11 of said Oil and Gas Lease. . . ." (Italics added.)

Upon the execution of the above agreement of November 3, 1938, Southwest Exploration Company paid to defendant city the sum of $25,000. Production was obtained from wells drilled under such agreement and prior to the commencement of this action defendant had received from the company the additional sum of $2,794.09, representing the two per cent payment provided for in paragraph numbered 2 of the agreement. Plaintiffs claim in this action that under the terms of their contract of employment with the city they are entitled to ten per cent of all the moneys received by the city under its contract with the Southwest Exploration Company. Defendants, however, contend:

1. That the contract between plaintiffs and defendant city is "ultra vires, is contrary to public policy, and is void."

2. That the evidence shows that plaintiffs abandoned the contract, and that therefore "the city was within its legal rights in cancelling said contract."

3. That there is no evidence showing that any of the oil produced by Southwest Exploration Company came from beneath the tide and overflow lands within the boundaries of the city of Huntington Beach, as contemplated by paragraph (b) of the contract between plaintiffs and defendant city.

4. That plaintiffs failed to show what portion, if any, of the money received by the city from Southwest Exploration Company constituted royalties as distinguished from payments for "easements and matters compromised."

5. That in any event the initial $25,000 payment to the city constituted a bonus rather than a royalty, and therefore plaintiffs are not entitled to a share thereof.

In support of its first contention defendant argues that the contract between plaintiffs and defendant "extends beyond the term of office of the members of the City Council which created it and attempts to bind their successors," and that therefore such contract cannot be upheld. The right of a municipality to employ special counsel is conceded.

The terms of the contract, above quoted, do not themselves

directly specify the period of time over which plaintiffs were to render services to defendant. However, Mr. Denio, one of the plaintiffs, testified that it was "understood" that plaintiffs would "attend to all . . . matters, under the City Attorney, of course" which might arise "during the time of . . . employment," including "Anything arising protecting Huntington Beach and its oil rights, what they conceived to be their rights." He further testified that during the fifteen-year period designated in paragraph numbered 2 of the employment contract plaintiffs were "whenever called upon," to protect whatever rights the city had, "Or assist in protecting them because we were under orders always of the City Attorney." It thus appears that the plaintiffs' services were to be available to defendant city for the full term during which they were to receive compensation.

█ It is our opinion, however, that the law is settled in California that a contract made by the council or other governing body of a municipality, which contract appears to have been fair, just, and reasonable at the time of its execution, and prompted by the necessities of the situation or in its nature advantageous to the municipality at the time it was entered into, is neither void nor voidable merely because some of its executory features may extend beyond the terms of office of the members of such body. In the absence of some other ground of avoidance, such a contract is binding upon the municipality and may not be summarily canceled by a successor council. See *McBean* v. *City of Fresno* (1896), 112 Cal. 159, 169 [44 P. 358, 53 Am.St.Rep. 191, 31 L.R.A. 794]; *Higgins* v. *San Diego Water Co.* (1897), 118 Cal. 524, 554 [45 P. 824, 50 P. 670]; *Marin Water etc. Co.* v. *Town of Sausalito* (1914), 168 Cal. 587 [143 P. 767]; *Williams* v. *City of Stockton* (1925), 195 Cal. 743 [235 P. 986]; *Cope* v. *County of Sutter* (1929), 206 Cal. 445, 454 [274 P. 750]; *Skidmore* v. *County of Alameda* (1939), 13 Cal.2d 534, 537 [90 P.2d 577]; *San Francisco* v. *Boyd* (1941), 17 Cal.2d 606 [110 P.2d 1036]; *Pacific Finance Corp.* v. *City of Lynwood* (1941), 114 Cal. App. 509 [300 P. 50, 1 P.2d 520]; *King City Union H. S. Dist.* v. *Waibel* (1934), 2 Cal.App.2d 65 [37 P.2d 861]; *Skidmore* v. *Dambacher* (1935), 6 Cal.App.2d 83, 87 [43 P.2d 1110]. █ The council of a municipal corporation is a continuing body and in legal contemplation remains the same council regardless of changes in its personnel (see *Cope* v. *County of*

*Sutter, supra*; *King City Union H. S. Dist.* v. *Waibel, supra*, at p. 68). As was stated by the District Court of Appeal in *Pacific Finance Corp.* v. *City of Lynwood, supra* (at pp. 518-519 of 114 Cal.App.) : ''. . . we know of no reason why a city, as well as an individual, should not be expected to keep faith with those with whom it contracts, or else respond in damages for its failure.'' ██ We conclude that the contract of employment here involved is valid, and binding upon defendant city, and that for the breach of that contract by defendant, i.e., the discharge of plaintiffs if such discharge was wrongful, plaintiffs are, under the long-established rule in California, entitled to recover the compensation specified by the terms of such contract of employment. (See *Baldwin* v. *Bennett* (1854), 4 Cal. 392; *Cole* v. *Superior Court* (1883), 63 *Cal.* 86, 88 [49 Am.Rep. 78]; *Webb* v. *Trescony* (1888), 76 Cal. 621, 623 [18 P. 796]; *Bartlett* v. *Odd Fellows Savings Bank* (1889), 79 Cal. 218, 222 [21 P. 743, 12 Am.St.Rep. 139]; *Carter* v. *Baldwin* (1892), 95 Cal. 475 [30 P. 595]; *Kirk* v. *Culley* (1927), 202 Cal. 501, 506 [261 P. 994]; *Elconin* v. *Yalen* (1929), 208 Cal. 546, 549 [282 P. 791]; *Zurich G. A. & L. Ins. Co., Ltd.* v. *Kinsler* (1938), 12 Cal.2d 98, 100-101 [81 P.2d 913]; *Echlin* v. *Superior Court* (1939), 13 Cal.2d 368, 375 [90 P.2d 63, 124 A.L.R. 719]; *Countryman* v. *California Trona Co.* (1917), 35 Cal.App. 728, 736 [170 P. 1069]; *McCully* v. *Gano* (1931), 116 Cal.App. 695, 698-699 [3 P.2d 348]; *Green* v. *Sherritt* (1936), 17 Cal.App.2d 732, 736-737 [62 P.2d 769].)

██ Defendant contends, however, in effect (as its second ground for reversal), 'that the evidence requires a finding that plaintiffs had abandoned the contract and hence that its action declaring the plaintiffs discharged and their contract canceled was proper. A survey of the record discloses that defendant's position on this point is not tenable.

It is undisputed that plaintiffs performed a large volume of work for defendant after the execution of the contract of employment. They drafted the charter which was adopted, conferred numerous times with officers of the city, carried out extensive legal research on the problems presented, and prepared a suggested new zoning ordinance for the city with a view to preventing the drilling of oil wells on certain uplands that would tap the oil sands under the ocean. Certain mem-

bers of plaintiffs' firm made two trips to the State Capitol during a legislative session to attempt to secure legislation giving defendant city title to the oil in controversy. It appears that the bulk of these services was performed during 1937, and that plaintiffs' activity lessened somewhat during the first half of 1938. Mr. Simpson, one of plaintiffs, testified, however, that he continued research for defendant city "to a more or less extent right up to the time when they [the city] attempted to terminate our employment." He also testified as follows concerning a conversation he had with the City Attorney of Huntington Beach in January, 1938: "We discussed generally the fact of the pending—of the condition of the legislation then pending concerning the Huntington Beach oil. In other words, we talked back and forth to the effect that the Legislature before its adjournment in 1937 had passed several bills affecting the Huntington Beach tideland oil matters. Two of these had been signed by the Governor. Both of those bills that had been signed by the Governor had been held up by referendum, and as I recall, I think there was also litigation filed trying to invalidate the referendum on the two. . . .

". . . we discussed the fact that everything was held in abeyance at this time because no one knew what the law would be, the statute would be that might be passed concerning the Huntington Beach tidelands proposition as a matter of legislation.

"Yes, I told [the city attorney] . . . that we should not do anything on any of the other propositions we had pending, other programs, except we should go ahead with our zoning set-up. I told him that I had checked over as carefully as I could all of the zoning ordinances, restrictive ordinances of the City of Huntington Beach. . . . and I had done considerable research into the legal angles involved and that I had come to the conclusion that their zoning ordinances were invalid and void."

Mr. Taubman, another of plaintiffs, gave the following testimony concerning a conversation he had with the Mayor of Huntington Beach in the late summer or early fall of 1938: "I don't know how the subject matter came up. The substance of it was that [the mayor] . . . told me—I rather imagine I made inquiry of him as to the status, and he stated that the Southwest Exploration Company, he thought, was

in a position to negotiate concerning the matter of the City securing some of the proceeds from the oil production, that the time had arrived when they were ripe, so to speak, for such negotiations. . . .

''Q. I will ask you, Mr. Taubman, whether or not you ever refused to furnish any advice or to do anything which was requested of you by the City of Huntington Beach, or any of its officers, in connection with procuring returns from oil on behalf of the City? WITNESS: A. I did not. In fact, I think on one of these occasions, I offered, when [the mayor] . . . told me he was negotiating with these gentlemen, one of whom I told him I had known for many years, *I offered to aid if I could and discuss the matter with him and he said no, he had the thing well in hand and he was going to get what the City was entitled to, either that, or no one else would get it.''* (Italics added.)

This testimony of plaintiffs Simpson and Taubman was apparently accepted by the jury as true and is sufficient to support plaintiffs' assertion that they did not abandon the contract. A conflict created by certain testimony of the city attorney and mayor simply presented an issue of fact which the jury resolved in favor of plaintiffs. Such determination is binding on us.

██ Defendant's third contention—that the oil produced by Southwest Exploration Company is not shown to have been drawn from lands included in plaintiffs' contract; i.e., from ''the tide* or overflow lands *within the City boundaries''* —is answered by the terms of the pertinent documents and by the inferences reasonably deducible from them and from the circumstances shown. Such documents are the lease of October 4, 1934, and the contract of November 3, 1938, between the city of Huntington Beach and the Southwest Exploration Company. The lease described the land from which oil was proposed to be extracted as lying within the boundaries of the city and between the line of mean high tide and the southwest boundary of the city. The compromise contract of November 3, under which the city has received the moneys here involved, referred to the lease and provided for its re-

*The word "tidelands" is used in the lease of October 4, 1934, to denote the area extending from the mean high tide line seaward for a distance of three miles, to the city's southwest boundary.

vivor upon the happening of certain contingencies. The same contract also referred to the ''Agreement for Easement No. 392,'' between the State of California and the Southwest Exploration Company, under which the company proposed to extract oil from certain described lands within the defendant city *lying along and seaward from the line of mean high tide,* and recited the fact that such lands were ''generally coextensive with the lands'' described in the lease of October 4, 1934. It is specifically provided in paragraphs 2 and 3 of the contract of November 3 that the payments by Southwest Exploration Company to the city shall be measured by income from oil taken from beneath the lands described in the ''Agreement for Easement No. 392.'' Therefore, it appears to be amply established that the payments made to the city by the company were on account of oil produced, or contemplated to be produced, only from the tide or overflow lands within the city limits hereinabove specified.

Defendant's remaining points—that the evidence fails to show what portion, if any, of the money received by the city from the operating company constituted royalties as distinguished from payments for ''easements and matters compromised,'' and that in any event the initial $25,000 payment to the city was a bonus rather than a royalty—are also disposed of by a consideration of the documents involved, which include the lease of October 4, 1934, the plaintiffs' contract for legal services, and the subsequent contract of November 3, 1938, between the city and the Southwest Exploration Company. Defendant argues that at least a portion of the payments made to the city by the operating company constituted rentals for the use of the easement under Ocean Avenue rather than royalties on the oil produced.

It is to be noted that the contract between plaintiffs and the defendant city was drawn by plaintiffs and hence any ambiguity therein, the interpretation of which is otherwise uncertain, must be construed against plaintiffs. But the same situation does not exist as to the contract of November 3, 1938, insofar as it purports to determine the character of the compensation paid by the Southwest Exploration Company to the city. The plaintiffs are not parties to that contract and did not draft it. The question on this point, which was before the trial court and jury for original determination, was as to the meaning which the plaintiffs and defendant

ascribed to the word "royalties" in their use of it in the contract for attorneys' fees. Defendant seeks to have us rule that as a matter of law the word must be construed in a narrow and limited sense as meaning a share, or the money equivalent of a share, of the "oil, gas or other hydrocarbon substances taken from the tide or overflow lands" within the city boundaries. But we find nothing in the contract which requires us, or which required the trial court or jury, to limit the word to such a restricted meaning.

The contractual provision for the percentage payment which is in controversy is conditioned upon this statement: "If a recovery is had by the City of Huntington Beach, either by a Court decision or by a compromise or settlement of the City's claims . . ." This condition clearly has been met. The agreement then continues "we are further to be paid out of all moneys paid to the City of Huntington Beach *as royalties,* or received by it out of the sale of its oil, gas or other hydrocarbon substances, if its royalties are paid to it in kind, the following . . ." (italics added) and then sets forth certain percentages ranging from ten to twenty per cent over a period of fifteen years. The primary purpose of this provision is to specify the fund *in relation to which* the amounts to accrue to plaintiffs shall be determined. While the contractual provision is that plaintiffs are "to be paid *out of all moneys*" so received by the city, it is obvious from other provisions that the parties do not intend to imply that money shall not be treated in its fungible sense or that the payments to plaintiffs must be made out of the same coins or currency which defendant may receive. Rather, it appears to be the intention to identify the fund *as an account* which is to constitute the basis for determination of the amount of plaintiffs' compensation. Thus it seems to be a fair conclusion that the plaintiffs in writing their letter to the city, which letter by acceptance of the city became the contract of employment, used language in its general or loose sense, rather than in its strictly limited or technical sense, and that such usage was understood by the city. The very fact, self-evident from the contract, that the parties contemplated that the city's recovery of royalties might be accomplished by compromise of its claims, suggests that they understood and used that word (royalties) in its general or loose sense and not in its strictly

limited sense. Manifestly, money received *in compromise of a claim* for royalties would not be directly a ''share of the oil'' or its proceeds; yet obviously it was not unreasonable for the jury to conclude that the parties understood the word ''royalties,'' as they used it, to include money which the city might recover by way of compromise or settlement of its claims to the oil in the so-called tidelands. It is entirely within reason that the parties may even have contemplated that the city's recovery might consist of a single payment. If one single cash payment in compromise and full settlement of the city's claim for royalties had been made, that fact alone would not support a claim that in the contemplation of plaintiffs' contract no royalty had been received by defendant and therefore no percentage thereof was due plaintiffs.

The words ''royalty'' and ''rent,'' it has been held, ''are used interchangeably to convey the same meaning''; i.e., ''the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows'' (*Nelson* v. *Republic Iron & Steel Co.* (1917), 240 F. 285, 291, 293 [153 C.C.A. 211]; *Elsinore Oil Co.* v. *Signal Oil etc. Co.* (1935), 3 Cal.App.2d 570, 573 [40 P.2d 523]). Defendant, in a statement in its brief hereinafter quoted, seems to imply that ''royalty'' is, or includes, the price paid by the operator to the landowner for the oil. It is obvious, from a consideration of the terms of the documents described above, and from other evidence in the record, that there was a conflict between the claims of defendant city and those of the State of California as to the ownership of the oil in the described lands. It is also obvious that the Southwest Exploration Company was desirous of exploiting those lands for oil and gas production and that *it was willing to pay compensation to both the defendant city and to the state for the use of those lands to the end stated*. It is a fair conclusion that all of the money it paid to the defendant city was paid for the purpose of enabling it to so exploit such lands. Apparently it had no other usage for such lands and contemplated no income from them except that to be derived from the production of oil, gas, and other hydrocarbon substances, and had no occasion to seek any easement over or through any of defendant's property except for the purpose of using that easement in the extraction of oil from the disputed property.

Continuing on this phase of its attack on the judg-

ment, defendant makes the assertion that "the contract between Southwest Exploration Company and the City shows on its face that it is for easements and other privileges and that Southwest Exploration Company expressly denies that the City of Huntington Beach has any rights to the oil or gas under the tidelands. *The facts surrounding the execution of this agreement* between the City and Southwest Exploration Company show clearly that *Southwest Exploration Company had bought the oil under the tidelands from the State of California* and that *what it was buying from the City of Huntington Beach was a right to drill from the uplands into that oil.*" (Italics added.) The foregoing argument is one which properly should have been addressed to the jury. Indubitably it was not based upon unconflicting evidence. The contract referred to by defendant, itself tends to refute the conclusion of fact for which defendant argues. It recites the fact as to the execution of the lease of 1934 by and between the Southwest Exploration Company and the city, the fact that such company had not operated under that lease, that it had procured the agreement of September 26, 1938, from the State of California, that it had proceeded *thereunder* to drill for oil in the same lands as were described in the lease, and that "*Huntington Beach* has claimed and now claims to be entitled to the payment of certain monies from Southwest *and to certain royalties by reason of any operations of Southwest* under and pursuant to said Agreement for Easement No. 392, and it is understood that Huntington Beach *claims for itself* the oil, gas and other hydrocarbon substances underlying said lands, which said claim is disputed and denied by Southwest . . .

"NOW THEREFORE, *in order to settle and compromise the claims of Huntington Beach to the payment of monies and royalties to it by Southwest,* . . . it is . . . agreed," etc. (Italics added.)

Coupled with the above-quoted declaration of the claim of the city to the oil and gas in the disputed lands, the jury (as asserted by defendant in its argument above quoted) had a right to consider the "facts surrounding the execution of this agreement." Among the surrounding circumstances which the jury may have considered significant is the fact that the compromise agreement with the Southwest Exploration Company was entered into by defendant city at a date *less*

*than one month after* plaintiffs had been notified of their discharge and only two months and five .days after adoption by the city council of the resolution (No. 814) by which it was sought to *cancel* plaintiffs' contract. In the light of all the evidence, and viewing it in aspects most favorable to sustaining the verdict, we cannot hold that as a matter of law it fails to support an implied finding that all of the money paid by the Southwest Exploration Company to the defendant was *by way of compromise of defendant city's claims for oil and gas royalties out of the disputed lands.* This was a *compromise* agreement. It purports to be based on the city's claims to the oil. We cannot sever such compromise agreement into parts and hold that any portion of the consideration was not grounded on the city's claim to the oil and royalties therefrom.

The fact that $25,000 of the $175,000-conditionally-fixed amount was paid in one payment does not preclude the finding that it was paid as royalty. In *Work* v. *United States ex rel. Mosier* (1923), 261 U.S. 352, 357 [43 S.Ct. 389, 391, 67 L.Ed. 693, 696], the United States Supreme Court said: "The bonus which was the result of bidding for desirable and profitable oil and gas leases secured for the members of the Osage Tribe the just value of the use of their property which the fixing of royalties in advance by the President was not adapted to give them. It was in effect a supplement to the royalties already determined. *It was really part of the royalty or rental in a lump sum or down payment.* We do not see how it can be classified as anything else. It was income from the use of the mineral resources of the land." (Italics added.)

The fact that the verdict rendered awards plaintiffs less than they might be entitled to recover does not prejudice defendant.

It is to be observed that the defendant is in a poor position to urge that the evidence does not show what portion of the money paid it by the Southwest Exploration Company is by way of royalty and what portion is by way of compromise of some other claim. The city made the contract with the company. *It was in the power of the city, when that contract was made, to specify therein exactly what amount was to be paid in compromise of the royalty claims and what amounts, if any, were to be paid for other considerations.* It knew at that time that plaintiffs claimed the right to compensation on the percentage basis fixed in their contract and that the

amounts to be paid plaintiffs depended on the royalties to be recovered, *by compromise or otherwise,* by the city. If the defendant city, knowing such facts, deliberately caused or negligently permitted the contract with the Southwest Exploration Company to be so phrased as to confuse the amount to be paid it for compromise of royalty claims with other amounts, the city, unless it is chargeable on the whole amount received, should bear the burden of proving segregation. This would follow upon principles akin to those attendant upon willful or negligent confusion of goods. (See 11 Am.Jur., pp. 529-530, secs. 3, 4; pp. 535-536, sec. 11; and pp. 537-538, sec. 13; see, also, 5 Cal.Jur. 488-489, sec. 4; 15 C.J.S. 961-964, secs. 4-6.)

We conclude that the evidence is not insufficient to support any essential implied finding, and that no prejudicial error has been shown.

The judgment is affirmed.

Shenk, J., Curtis, J., and Carter, J., concurred.

EDMONDS, J., dissenting.—The conclusion of my associates that the contract sued upon in this case ''is binding upon the municipality and may not be summarily canceled by a successor council'' is rested upon decisions which, in my opinion, are not determinative of the question. Generally speaking, in the exercise of its business or proprietary power, the power of a board to make a contract binding over a term of years depends upon the subject matter, and the courts and text writers recognize, as being in a special category, those relating to personal services, particularly those of a confidential nature. No case has been cited in the majority opinion, or by counsel, upholding a contract with an attorney for a period of time beyond the terms of office of the members of the employing board, and the only decision in this state, except one in which the authority of a school board to employ a superintendent was challenged, concerned the right of an engineer to recover from a county upon a contract to extend a bridge. (*Cope* v. *County of Sutter,* 206 Cal. 445 [274 P. 750].)

In most jurisdictions, the rule has been adopted that where a contract of employment, by its terms extends beyond the term of the appointing municipal body, and the services to be

rendered are subject to the supervision of that body, the contract is invalid. The courts of a few states follow the so-called minority rule, holding that, in legal contemplation, the new board is the one that entered into the contract. Under these decisions, unless the agreement is unreasonable it cannot be rescinded except for cause. (See cases collected in 70 A.L.R. 794, 802.) But the courts which follow the minority rule do not apply it to contracts providing for the employment of an attorney. They recognize the confidential relationship of attorney and client and hold that a municipal board should be free to select its counsel.

There are many reasons of public policy why an attorney's contract for professional services to be rendered beyond the term of the board which selected him should not be enforced against a sucessor body which is dissatisfied with his efforts. Subsequently elected public officers are directly responsible to the people for the conduct of the municipal affairs, and in performing their duties, it is of the utmost importance that they should have the right to select the lawyer who is to carry out their plans and purposes. The very reason for a change in personnel of a city council may be the electors' dissatisfaction with the manner in which the person employed to perform such special services has conducted the municipal business. To hold that the new council is required to retain that person because of the action of its predecessor in entering into a contract with him, may seriously interfere with the exercise of a discretion which the members of the governing body should be permitted to employ in its conduct of the city's affairs. Moreover, if the attorney was engaged on a contingent basis, the subsequently elected officials may decide to allow him to continue representation of the city's interests, regardless of their lack of confidence in him, rather than risk criticism by incurring an obligation to pay fees for services not completed.

It should also be kept in mind that, under circumstances such as are shown in the present case, although the city council is the immediate employer, the client for whom the legal services are to be rendered is the city. The members of the council are in a sense, trustees of the public welfare, and they may well insist upon the benefit of advice from counsel in whose capacity and judgment they have the fullest confidence. The assertion of public rights which are not entirely clear usually requires the expenditure of large sums of money as

well as the determination of particular policies, and the decision as to action in a particular way should not be affected by either friction or distrust in the relations of attorney and client.

Recognizing these principles as controlling, although the Supreme Court of Indiana, following the minority rule, has held that contracts extending beyond the terms of office of the members of a governing body are valid if made in good faith, it places in a different category one providing for the employment of an attorney beyond the time when a change will occur in the membership of the employing board (*Board of Commrs. v. Shields,* 130 Ind. 6 [29 N.E. 385]). Such a contract, said the court, is contrary to public policy and void, because it "deprives the board, as reorganized from year to year, of the right to employ its attorney for the next following year. If such contracts are binding, then, no [matter] . . . how distasteful an attorney may be to the members of the board, or how little confidence they may have in his ability, legal learning, or honesty, so long as he performs the conditions of the contract on his part they are bound to recognize him, accept his services, and assume the responsibility; and if the contract in question, extending, as it does, over a period of three years, is valid, why may not a like contract, covering a period of six, nine, or a dozen years be upheld?" (*Jay County v. Taylor,* 123 Ind. 148 [23 N.E. 752, 7 L.R.A. 160].)

More recently, the Appellate Court of Indiana held that "a board, in order to dispense with the services of an attorney, employed while organized in part at least with a different membership, and thereby be free to select one of its own choosing, [should not] be compelled to prefer charges against an attorney so employed, or allege and prove dishonesty or a lack of ability on his part, or that he was distasteful to its members, or that they had no confidence in him, as appellee's contention would imply." (*Jessup v. Hinchman,* 77 Ind.App. 460 [133 N.E. 853].) And the Supreme Court of Alabama declared that a contract with an attorney to act as counsel for a board of revenue beyond the term of the board as it existed when the services were authorized was contrary to public policy. In effect, said the court, such a contract ties the hands of the succeeding board which "should at all times be free to select its own confidential legal adviser. Such has been the ruling in New York, Ohio, New Jersey, Indiana,

Illinois, Kansas, Iowa, and Colorado." (*Willett & Willett* v. *Calhoun County,* 217 Ala. 687 [117 So. 311]. And see *Ferkin* v. *Board of Education,* 300 N.Y.S. 885; *Light* v. *Lebanon County,* 292 Pa. 494 [141 A. 291]; *McCormick* v. *Hanover Township,* 246 Pa. 169 [92 A. 195]; *Wilmington* v. *Bryan,* 141 N.C. 666 [54 S.E. 543]; and annotation, 70 A.L.R. 794, 799-802.)

Considering the California decisions, although *King City Union H. S. Dist.* v. *Waibel,* 2 Cal.App.2d 65 [37 P.2d 861], approves the minority rule, the true basis for its holding is the universally recognized authority of a school board to contract with a superintendent or teacher for a period extending beyond the terms of the members of the board. Also, a contrary conclusion would nullify sections 2.90 and 2.92 of the School Code, which authorize a school district to employ a district superintendent for a period of four years. But in New York, it was recently held that a contract made in July, 1933, by a school board, purporting to employ an attorney at law for a period of two years, was an attempt to impinge upon the functions of members of that body elected in 1934 and was void. (*Ferkin* v. *Board of Education, supra.*)

*McBean* v. *City of Fresno,* 112 Cal. 159 [44 P. 358, 53 Am.St.Rep. 191, 31 L.R.A. 794], upheld a contract for the maintenance of a sewer farm. In *Higgins* v. *San Diego Water Co.,* 118 Cal. 524 [45 P. 824, 50 P. 670], the court considered the validity of a contract leasing a water plant for a term of 20 years. A contract to supply water for 10 years was before the court in *Marin Water etc. Co.* v. *Town of Sausalito,* 168 Cal. 587 [143 P. 767]. *Williams* v. *City of Stockton,* 195 Cal. 743 [235 P. 986], concerned a contract for building a city hall. A later-elected city council repected the contractor's bid which had been accepted by its predecessor. This court held that the city was bound by its original action. In *Skidmore* v. *County of Alameda,* 13 Cal.2d 534 [90 P.2d 577], the question for decision was whether the plaintiffs' claim was an account or the statement of several causes of action, some of which were barred by lapse of time. And the contract ordered executed in *San Francisco* v. *Boyd,* 17 Cal.2d 606 [110 P.2d 1036], was one providing for a survey of traffic conditions to be completed in five years by the contractor and a staff of his own selection; the question now before the court was not presented or considered.

Nor does *Pacific Finance Corp.* v. *City of Lynwood,* 114

Cal.App. 509 [300 P. 50, 1 P.2d 520], have any bearing upon the present problem, for the recovery upheld in that case was upon a contract to prepare plans and other writings required to carry through a street improvement project, compensation to be paid on the basis of a stated percentage of the construction cost. *Skidmore* v. *Dambacher*, 6 Cal.App.2d 83 [43 P.2d 1110], held valid a contract to secure certain information during an unspecified period of time. The court decided that the services had been performed within a reasonable period.

It requires no departure from the principles stated and applied in any of these cases to classify the contract now before the court as a valid one, but subject to an implied in law agreement that it may be terminated by the successor body with the obligation to pay only the reasonable value of the services rendered to the date of cancellation. Very evidently, the jury's verdict for $2,000 was rendered in the belief that the sum awarded, plus the retainer paid by the city, is a reasonable amount of compensation for the services which the respondents performed. For the verdict was not responsive to any issue laid down by the pleadings, nor can it be justified under the theory of the conclusion reached by a majority of the court. As the city asserts, obviously if the contract is valid and not subject to cancellation, the respondents are entitled to $2,794, not $2,000. Under these circumstances, the applicable rule is stated in *Gundry* v. *Atchison T. & S. F. Ry. Co.*, 104 Cal.App. 753 [286 P. 718], as follows: "While the defendant cannot ordinarily complain that the verdict is for an amount less than it might have been, if there is any evidence at all to sustain the verdict, a verdict may not be sustained which attempts generally to somewhat equalize financial conditions." The Gundry and other cases which reach the same conclusion are controlling, this court has said, and require a reversal if the jury renders a verdict for an amount different from the only sum which the plaintiff could recover under the issues framed by the pleadings. (*American States Pub. Service Co.* v. *Rath*, 2 Cal.2d 670 [42 P.2d 1010].)

For these reasons, I am of the opinion that the judgment should be reversed.

GIBSON, C. J., and TRAYNOR, J.—We dissent. While we agree with the conclusions reached in that portion of the majority opinion which holds that plaintiffs were wrongfully

discharged from their employment, we cannot concur in the view that plaintiffs are entitled to recover the compensation specified in the contract of employment. When an attorney employed under a contingent fee contract is discharged without cause, he should be entitled to recover the reasonable value of the services performed by him prior to his discharge. (See concurring opinion in *Salopek* v. *Schoemann*, 20 Cal.2d 150, 156 [124 P.2d 21]; *Cole* v. *Myers*, 128 Conn. 223 [21 A.2d 396, 136 A.L.R. 226]; *Hubbard* v. *Goffinett*, 253 Ky. 779 [70 S.W.2d 671]; *Pye* v. *Diebold*, 204 Minn. 319 [283 N.W. 487]; *Martin* v. *Camp*, 219 N.Y. 170 [14 N.E. 46, L.R.A. 1917F 402]; *Cavers* v. *Old Nat. Bank & Union Trust Co.*, 166 Wash. 449 [7 P.2d 23]; see also cases in 136 A.L.R. 254.) He should not be permitted to recover the fee fixed in the contract, however, for the reasons stated in the concurring opinion in *Salopek* v. *Schoemann, supra*. The present case was tried and submitted to the jury upon the theory that the proper measure of damages for breach of an employment contract of this nature is the compensation fixed by the terms of the contract. In our opinion, there should be a retrial of the issue of damages for that reason. While it is true that the verdict does not award plaintiffs a sum commensurate with that provided for in the contract, it is impossible to determine how the jury arrived at its verdict in view of the theory upon which the case was tried.

Appellant's petition for a rehearing was denied September 1, 1943. Gibson, C. J., Edmonds, J., and Traynor, J., voted for a rehearing.