No.  90-291

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

JOHN L. BINK,

       Plaintiff and Appellant,

-v-

FIRST BANK WEST, GREAT FALLS, INC.
and FIRST BANK SYSTEM, a Minnesota
Banking Company,

       Defendants.

FILED

JAN 1 0 1991

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighth Judicial District,
              In and for the County of Cascade,
              The Honorable Thomas M. McKittrick, Judge presiding.


COUNSEL OF RECORD:

     For Appellant:

          Alexander Blewett, III; Hoyt & Blewett; Great Falls
          Montana

     For Defendants:

          Stephen Bell; Dorsey & Whitney; Billings, Montana
          Gene Daly, Helena, Montana


                 Submitted on Briefs:  November 1, 1990

                        Decided:  January 10, 1991

Filed:

                        Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from an order of the Montana Eighth Judicial District Court, Cascade County, awarding attorney fees to the plaintiff John Bink's former attorney Gene Daly. The sole issue on appeal is whether the District Court erred in awarding these fees. We reverse and remand for a full hearing on the subject of attorney fees.

Bink contacted and retained Daly as his attorney for the purpose of litigating Bink's cause for wrongful discharge in October of 1986. Bink makes several allegations regarding Daly's performance as his attorney. He also alleges that he eventually terminated Daly for cause. Bink contacted the law firm of Hoyt & Blewett in October of 1987 and requested that they take over his representation, asking Daly to step down as his attorney. Bink alleges that Daly continually refused to withdraw.

On November 30, 1987, Bink filed a formal motion for change of attorney with the District Court. On May 6, 1988 at the hearing on the motion, the District Court agreed to sign an order allowing Hoyt & Blewett to proceed with Bink's case provided Bink paid Daly $5,127.00 alleged as Daly's costs attributable to his work on Bink's case.

In its Order Substituting Counsel For Plaintiff, the court ordered

> that the law firm of Hoyt & Blewett of Great Falls, Montana, is substituted as counsel of record for the plaintiff in place of Attorneys Gene B. Daly, Joseph W. Duffy and Walter M. Hennessey.
> IT IS FURTHER ORDERED that John L. Bink shall

2

immediately pay to Gene B. Daly <u>the sum of $5,127.00</u>.
FURTHERMORE, IT IS ORDERED that Attorneys Gene B. Daly, Joseph W. Duffy, and Walter M. Hennessey have an attorneys' lien on the claim of plaintiff, <u>the amount of such lien to be determined in the appropriate manner at a later time</u>. (Emphasis added.)

Hoyt & Blewett took Bink's case to trial on a one-third contingency fee basis, and on November 27, 1989 they received a verdict in favor of Bink against the defendants in the sum of $175,000.00. Approximately four months later, on April 3, 1990, without an appropriate motion, notice or hearing, the District Court issued a memorandum and order awarding Daly $19,796.06 in attorney fees from Bink.

We have continually held that a district court's granting of attorney fees should be based on the introduction of competent evidence:

> [I]n contested cases we are inclined to follow those states requiring the introduction of proof from which a reasonable fee may be determined. <u>To award a fee in such a case without proof would be to disregard the fundamental rules of evidence. An award of fees , like any other award, must be based on competent evidence.</u> See <u>Lyle v. Lyle</u>, (Fla.App.1964), 167 So.2d 256, 257. Furthermore, the proper determination of a legal fee is central to the efficient administration of justice <u>and the maintenance of public confidence in the bench and bar</u>. (Emphasis added.)

Crncevich v. Georgetown Recreation Corp. (1975), 168 Mont. 113, 120, 541 P.2d 56, 59; <u>see</u> <u>also</u> First Security Bank of Bozeman v. Tholkes (1976), 169 Mont. 422, 429-430, 547 P.2d 1328, 1332; Talmage v. Gruss (1983), 202 Mont. 410, 412-413, 658 P.2d 419, 420-421. In its substitution order the District Court noted the amount of Daly's lien would be determined later in the appropriate manner. The appropriate manner in this case is pursuant to a hearing.

3

Thus, the court erred when it made the award without an evidentiary hearing and without the appropriate motion and notice required by Rule 5(a), M.R.Civ.P. Accordingly, we reverse the District Court's order and remand the cause to a different judge for a determination of whether Daly was in fact terminated for cause and the total appropriate fees and costs, if any, to be awarded attorney Daly. Such award should be either increased or decreased as necessary by the prior award of $5,127.00 in alleged costs awarded to Daly.

**REVERSED and REMANDED for further proceedings consistent with this opinion.**

Justice

We Concur:

Justices

District Court Judge Ted Mizner
sitting for Justice Harrison

District Court Judge Frank M. Davis
Sitting for Chief Justice Turnage

Justice John C. Sheehy, dissenting:

I dissent.

In this cause the district judge awarded Gene Daly a fee of one-third of any attorney fee recovered herein. While the order for Daly's fee is couched in terms of the attorney fee received by the firm of Hoyt and Blewett, the responsibility for the payment of that fee is on the plaintiff, John L. Bink, unless when Hoyt and Blewett accepted employment by Bink, they agreed with Bink to pay whatever fees Daly had incurred at the time they took over the case. The amount of Daly's fee, however, as ordered by the court is 1/9 of the total recovery of Bink, which, in the circumstances of this case, is a proper fee.

John L. Bink was discharged by his employer Banks on October 20, 1983.

Nearly three years later, on August 6, 1986, Bink requested Daly to represent him in his claims against the Banks. Daly was already engaged in suing the same Banks for two other former employees, for which cases he had plenty to do. Nevertheless, in the discussion with Bink in their first meeting, Daly agreed to represent Bink, and noted the impending date of the statute of limitations. Daly contends that he agreed to represent Bink for a contingent fee of 40%. Bink contends that the oral agreement was for 33 1/3%. (Of course, Daly should have obtained a written agreement from Bink.) The District Court apparently resolved this conflict in favor of the client by awarding Daly 1/3 of any attorney fees received.

5

In time to avoid the statute of limitations, Daly filed on Bink's behalf a seven-page complaint against the defendants. That complaint contains all of the essentials upon which Bink's case was eventually tried. The complaint was later amended once through an agreement with the Banks to eliminate John Reichel as a party defendant, after Daly's services had been terminated. Aside from dividing into two counts the wrongful discharge claim and the negligence claim against the defendants, which causes were combined in Daly's complaint, the allegations in the amended complaint are essentially the same as those in the complaint filed by Daly. There was never a pre-trial order issued in this case so the issues on which the case was tried were framed by Bink's complaint, as amended, and the joint response of the Banks to the amended complaint. The joint response again is essentially the same as their original separate responses, except for the addition of some purported affirmative defenses which are in reality only repetitious of their earlier affirmative offenses in their first responses.

Bink moved in District Court to discharge Daly as his attorney on November 30, 1987. First West Side National Bank of Great Falls had filed its answer to the complaint. The answer of Reichel was filed on December 15, 1987, and that of First Banks System on December 23, 1987. The order substituting counsel was not granted until May 9, 1988, and then only after a hearing before Judge McKittrick.

In the hearing before the District Court on the motion to substitute counsel, the following colloquy occurred:

> THE COURT: Well, the main concern that I have right at the moment is Mr. Bink wants to move his case forward and there is a dispute. I think it's -- it goes without saying that Mr. Daly is owed a certain amount of money, in addition to whatever the costs were.
>
> What is your objection to just having a lien placed on the case, accepting the costs now and we can have a hearing on the other monies at a later date to allow the case to go forward?
>
> MR. DALY: I would go for that. And I've already explained to them that -- their problem was I accept my cost and leave. I told them I would accept a cost, take a lien on the case and then decide what percentage of that case if settled I am entitled to.
>
> THE COURT: I think you are entitled -- just for starters, from what I know about the case, you are entitled to more than your costs. That goes without saying here, and but I think for the benefit of the client, are you in a position to tender those costs now with the understanding that there are still monies owed, or at least the court is going to consider argument as to monies owed in the future?
>
> MR. BLEWETT: Your Honor, I guess we really aren't because we don't know what the costs are for Mr. Bink. We don't know what work Mr. Daly has done. Mr. Bink tells us he has filed a complaint and a summons. [The actual state of the pleadings was set out above].
>
> Now, I am just willing to say he can prove his costs and he can prove his fees that he is entitled to later.
>
> THE COURT: I thought that tender of the $5,100 or $5,000+ was for cost?
>
> MR. BLEWETT: We are willing to say this is for everything and you are out of the case, Mr. Daly. And we'll put this up now. I am not saying that it was -- I don't think Mr. Bink knows what he did for $15,000 had anything to do with Mr. Bink. We were just going to resolve --
>
> THE COURT: Weren't depositions taken, pleadings filed?

7

MR. BLEWETT: Not in Mr. Bink's case. There hasn't even been an appearance by the defense in Mr. Bink's, to my understanding.

MR. DALY: Your Honor, that is not true, but go ahead.

MR. BLEWETT: I don't know anything about it because we haven't got the file.

THE COURT: Here is what the court is focusing on. Mr. Bink is entitled to move his case forward, and this dispute should not hold it up. But I think you ought to get together and tender at least costs, and then the other amounts we ought to talk about at a later date to allow the case to go forward. If that is agreeable with everybody that would be agreeable with me.

MR. BLEWETT: It is agreeable with us except I don't-- and if his costs on John Bink's case are $5,127 to date, we'll pay that too, your Honor. I just don't know that that is the case, and I guess we're going to have to talk with John and see what he says.

THE COURT: I think that is what that $5,100 is for. That's what my understanding was, that was a tender of the costs.

. . .

MR. BLEWETT: We'll pay them, if he says that the $5,127 was for costs attributable to John Bink's case, we'll pay those costs to him on Monday.

THE COURT: All right.

MR. BLEWETT: And then --

THE COURT: Then he has a lien on the case for the rest of it, and we'll have a hearing to determine what the rest of those monies are at a later date.

MR. BLEWETT: What the value of his lien is.

THE COURT: Is that agreeable to everybody?

MR. DALY: Yes, your Honor, that's agreeable.

THE COURT: We'll be in recess.

MR. BLEWETT: Would you like an order on that?

THE COURT:    Yes.    Would you prepare the order, Mr. Blewett?

MR. BLEWETT:    Okay.    Thank you.

The order, signed by the court on May 6, 1988, provided in part:

> It is further ordered that John L. Bink shall immediately pay to Gene B. Daly the sum of $5,127.

> Furthermore, it is ordered that attorney Gene B. Daly, Joseph W. Duffey, and Walter M. Hennessy have an attorneys' lien on the claim of plaintiff, the amount of such lien to be determined in the appropriate manner at a later time.

From the foregoing, there could be no doubt that in the perception of the District Court, the amount of costs was agreed upon, was ordered to be paid, and that there would be further proceedings with respect to the lien on the cause in favor of Gene B. Daly.

While the order of the District Court permitted the substitution of counsel, it made no mention of the papers which had come into the possession of Gene Daly as the result of his representation of Bink.    Daly refused to surrender those papers, as he explained in a June 8, 1988 letter to the firm of Hoyt and Blewett:

> To be real honest all of your delays result from your refusal to pay the money, first for costs and now, because my attorneys fees are contingent, a contract to guarantee the fees and percentage.    The judge has made this abundantly clear.

> I am willing to give you my work product as soon as I am sure the matter is at rest -- NO PROBLEMS.

As will be demonstrated below, Daly's legal position on the matter was absolutely correct.

9

A critical item in all of the pending cases against the Bank employers, but especially in this case for Bink, was a document described as First Bank System's "New Direction," a document which eventually led to the liability of First Banks System in this case. Daly had turned up information about the "New Direction" in his other cases, information which the Hoyt and Blewett attempted to get through another attorney in Great Falls. The following appears in a letter from the Hoyt and Blewett dated September 23, 1988 to the other attorney:

> When, in turn, I requested information concerning First Banks System's "New Direction" and a copy of the deposition that Gene Daly took of Jim Connelly, I was astounded at your refusal to divulge this information to me.
>
> Now I understand that Mr. Daly is calling the shots for you and will not permit you to provide us with reciprocal information.

Following that refusal, the firm of Hoyt and Blewett pursued its own discovery, and obtained the "New Direction" document. In the circumstances existing at the time, however, Bink had no legal claim to those papers from Daly. The document had been turned up by Daly's work, and Hoyt and Blewett attempted to get it without going through Daly.

In Montana, there are two liens that an attorney acquires when he undertakes the representation of a client. The first is a statutory lien, set out in § 37-61-420, MCA, which provides in pertinent part:

> (2) From the commencement of an action or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action or counterclaim which attaches to a verdict,

10

report, decision or judgment in his client's favor and the proceeds thereof in whose hands they may come. Such lien cannot be affected by any settlement between the parties before or after judgment.

Daly's statutory lien is the legal basis for the order of the District Court in this case awarding him 1/9 of the total recovery, that being the District Court's assessment of the value of the services that Daly provided the client in the prosecution of the client's claim.

There is however, another lien, a common law lien, that an attorney acquires in the retention of the papers that come to him in the course of his representation of a client. The retention lien, however, is lost, if the attorney gives up the client's papers without first requiring either payment or security for his interest in the case. Required reading on this subject (I especially recommend it to the plaintiff's bar) is Morse v. Eighth Judicial District Court (Nev. 1948), 195 P.2d 199.

In Morse, the clients had entered into a contingent fee agreement with the Morse firm on July 11, 1947. The Morse firm filed a complaint on their behalf on December 1, 1947. The defendants appeared by demurrer or motion to strike, and these pleas were pending when on April 12, 1948, the plaintiffs in the action filed a motion to substitute another attorney for the Morse firm. The motions were heard in the court on April 28, 1948, at which time the Morse firm stated there was no objection to the substitution of attorneys. The court thereafter entered an order substituting the attorneys, but requiring the Morse firm to turn over to the substituted firm all of their papers and correspondence

11

pertaining to the suit. When the lower court did not rule on the motion of the Morse firm for rehearing, the firm petitioned the Nevada Supreme Court in an original proceeding, protesting the terms of the lower court order substituting attorneys. In the proceeding before the Supreme Court, Morse did not contest the power of the court to substitute attorneys. He maintained however, that the lower court was without jurisdiction to discharge and destroy the Morse firm's attorney's lien upon the papers in their possession and that their lien would be destroyed by delivering the papers in compliance with the order.

In deciding the case, the Nevada Supreme Court first distinguished between the statutory or "charging" lien and the lien on the attorney's papers, called the "retaining" lien. The Nevada Court said:

> . . . But the "aforesaid lien" quoted by respondents immediately preceding this assertion is the lien provided by § 89-23, NCL giving the attorney a lien upon his client's cause of action which attaches to the judgment etc. and the proceeds thereof. This is a special or charging lien and was the kind of lien with which Mr. Justice Ducker was dealing in Berrum v. Georgetta, supra. It is entirely separate, distinct and remote from a retaining lien. The lien affected by the lower court's order in the present case is distinctly a retaining lien. This attaches to all papers, books, documents, securities, and money that come to the attorney in the course of his professional employment by the client without any special contract regarding it. The charging lien, such as considered in Berrum v. Georgetta, is a lien on the judgment obtained from the client for the attorney's services rendered in obtaining it. The former depends upon possession. The latter does not. The former applies to a general balance for all professional services performed whether in the action itself or in prior actions or for general legal services. The latter attaches to the judgment or proceeds for services performed in the particular action only. The former is "passive" and not enforceable by proceedings to

12

foreclose, except as may be accomplished through some incidental proceeding. The latter may be actively enforced as in Berrum v. Georgetta. . . .

195 P.2d at 202.

The Nevada Supreme Court went on to point out that the adoption of a charging lien by statute does not abrogate the common law lien for retention of papers, pointing out that many federal and state courts have so held. In discussing the various authorities, and after a thorough review of other cases, the Nevada Court decided:

> . . . The record indicates that the court's reasoning was simply that the right of substitution existed and that the substitution would have been a more or less vain act without providing the substituted attorney with the necessary data to enable her to continue the litigation, but, as has been seen, this is the very strength and purpose of an attorney's retaining lien. The court was without jurisdiction to discharge and destroy such lien without providing for the payment or security for the payment of the attorney fees secured thereby.
>
> The clients complained bitterly that the tactics of the attorneys have greatly prejudiced the formers' rights, have impeded and retarded litigation; . . .
>
> . . .
>
> . . . Accordingly, it would seem that the extent of the recovery of the main action, although presently contingent and possibly problematical, should not make it difficult for the clients to provide such bond or security as may be fixed by the court. The litigation involving the attorney's claim for fees and the client's cross complaint for damages could then be tried and determined in an orderly manner.

195 P.2d at 206-207.

The Nevada Supreme Court then entered an order requiring that the attorneys turn over the papers to the substituted attorneys,

13

upon the clients providing a bond or other security in the amount of extent to be determined by the lower court.

The Morse case fits exactly the situation that Daly faced when he was substituted as counsel for the plaintiff Bink. He had framed a complaint upon which Bink's case depended, he had received the answers from the defendants, and he had in his file the key to eventual liability, the "New Discovery" document. He informed the substituted counsel that he was holding these papers until a contract or other agreement was reached respecting his fee. He was absolutely legally correct to do so. Events have proved his foresight was correct. Not only does Bink refuse to pay him any fee, but even now he contests the cost bill to which his substituted attorneys agreed before the District Court.

It is sharper than a serpent's tooth for a lawyer to have a thankless client. Bink, nearing the end of his time under the statute of limitations, found a lawyer with some expertise in the matter willing to take on his case on a contingent fee basis, and to advance costs of his behalf because Bink claimed that he had "no funds." The District Court in this case was considerate in his award of a fee to Daly. One-ninth of a total recovery is little enough for the lawyer who saved Bink's cause of action and whose efforts outlined its form, and through whom the clinching document was obtained.

When a client enters into a contingent fee contract with an attorney to pursue for the client a legal right, one would think that the basic principles of contract law should apply as with any

14

other contract. An intervening problem when a breach of a contingent fee occurs is that even though the client is bound by the contract, as well as the attorney, the courts nevertheless are reluctant, through the application of ordinary contract law, to override the client's freedom to retain counsel whom he trusts and in whom he has confidence, and to discharge an attorney with whom he is dissatisfied. The California experience is illustrative. Formerly, California held that an attorney employed under a contingent fee contract and subsequently discharged without cause was entitled to recover the full amount of the contingent fee agreed upon regardless of the amount of work he had put in the case and even though the success contemplated under the contingency was brought about by another attorney whom the client has substituted. Denio v. City of Huntington Beach, 140 P.2d 392 (1943); Zurich General Accident and Insurance Company v. Kinsler, 81 P.2d 913 (1938). In those cases, the breach of contract law was strictly applied. Later, however, in Fracasse v. Brent, 494 P.2d (Cal. 1972), it was held that the remedy of a wrongfully discharged attorney was limited to recovery in quantum meruit of the value of the services rendered up to the time of the discharge and that the attorney was not entitled to sue for full damages for the client's breach of the contingent fee contract.

The State of Idaho, when faced with this problem, refused to follow either the former California cases or the Fracasse case, and said in Anderson v. Gailey, 606 P.2d 90, 96 (Idaho 1986):

> Although the client is only liable for the attorney's actual losses and not necessarily the full contract fee,

15

a client who discharges one attorney and hires another will nevertheless pay more in attorney's fees than if he had only retained the services of one attorney. The services performed by the second attorney will generally be somewhat duplicative of services already performed by the first attorney attorney, and those duplicated services ordinarily would be reflected both in the first attorneys recovery and in the fees recovered by the second attorney. In this sense, the client's freedom to discharge an attorney is burdened. However, it is not inappropriate for the client to bear this burden where he has discharged his first attorney without cause. In sum, an application of general principles of contract law in this type of case will not generally result in the imposition of a significantly greater burden on the client than that which results from a recovery in <u>quantum merit</u> under the California courts rule in <u>Fracasse</u>.

We conclude that a proper application of the general principles of contract law best remedies the evils pointed out by the California court in <u>Fricasse</u>, and yet does so without engaging in the dubious practice of finding "implied in law" terms in the contingent fee contract and without stripping the attorney entirely of his right to rely on the contingent fee contract and to sue for its breach. The California court's decision in <u>Fracasse</u>, as the dissent in that case noted, reduced "an attorney-client contract to a hollow and meaningless act" and to an agreement that "may be dissolved into thin air at the mere whim of a client" (citing authority). In our view, the attorney-client contract is still a contract, and either the attorney or the client is entitled to sue for damages for its breach.

Based on the foregoing, the Idaho court remanded the cause to the District Court with these instructions: The court was to consider the expenses saved by the first attorney because he was not required to complete the performance of the contract, and to consider the value to the first attorney of being relieved of his obligation to continue to perform those services and expend further time; in making those determinations on remand, the court was also to look to the services performed by the second attorney, the substituted counsel, as an indication of the services which

16

remained to be performed and which the first attorney was no longer obligated to perform. It would also be recognized by the district court on remand that some of the services performed by the substituted counsel would be duplicative of those already performed by the first attorney and the first attorney's recovery on contract was not to be reduced by the value of those services. 606 P.2d at 96-97.

When push comes to shove on the remand of this case, the first duty of the trial court would be to find whether Daly was discharged for cause under the facts of the case. If he was discharged without cause, merely because the client was dissatisfied with the progress of the client's case but was not otherwise prejudiced, then the rule adopted by the Idaho court in Anderson v. Gailey should apply as a proper rule in Montana. When the cause comes back to this Court, if it does, we will have a proper record on which to make a decision.

In the meantime, on the record before us now, I would affirm the District Court.

_____
                Justice

17